ATLAS MFG. CO. et al. v. STREET & SMITH.

(Circuit Court of Appeals, Eighth Circuit. March 26, 1913.)

No. 3,826.

**1. TRADE-MARKS AND TRADE-NAMES (§ 61\*)—REGISTRATION—EFFECT.**

Act Feb. 20, 1905, c. 592, 33 Stat. 724 (U. S. Comp. St. Supp. 1911, p. 1459), authorizing registration of trade-marks, provides that the applicant shall specify the class of merchandise and the particular description of goods comprised in such class to which the trade-mark is appropriated, a description of the trade-mark itself, and a statement of the mode in which it is applied. *Held* that, where complainant registered the words "Nick Carter" as a trade-mark and described the goods to which it was attached as "a weekly periodical devoted to fiction," the only property entitled to protection under such trade-mark was a periodical; and hence complainants were not entitled to restrain the use of the term "Nick Carter" as the name of a personage shown in moving pictures.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 76; Dec. Dig. § 61.\*]

**2. TRADE-MARKS AND TRADE-NAMES (§ 24\*)—LITERARY PROPERTY.**

Literary property in a book cannot be protected by a trade-mark, nor otherwise than by copyright.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 27; Dec. Dig. § 24.\*]

**3. TRADE-MARKS AND TRADE-NAMES (§ 68\*)—UNLAWFUL COMPETITION—SIMILARITY OF GOODS.**

That complainants for many years had published detective stories embodying the character "Nick Carter" did not entitle them to an injunction restraining the use of such name to designate a character represented on moving-picture films depicting a detective story, on the theory of unlawful competition and trade; there being no similarity in the "class of goods" offered for sale.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 79; Dec. Dig. § 68.\*]

**4. COPYRIGHTS (§ 16\*)—LITERATURE—CHARACTER.**

That complainants' "Nick Carter" detective stories were not of the highest class of literature did not bar complainants from relief in the courts against piracy; the stories being proper subjects of copyright.

[Ed. Note.—For other cases, see Copyrights, Cent. Dig. § 17; Dec. Dig. § 16.\*]

**5. LITERARY PROPERTY (§ 4\*)—RIGHTS OF AUTHOR.**

The author of a literary work, at common law, has the exclusive right to the first publication only, but has no exclusive right to multiply or

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

control subsequent copies by others; this right being entirely a creature of statute, secured by the copyright laws of different governments.

[Ed. Note.—For other cases, see Literary Property, Cent. Dig. § 3; Dec. Dig. § 4.*]

**6. LITERARY PROPERTY (§ 3*)—LITERARY WORKS.**

Neither the author nor proprietor of a literary work has any property in its name; that being a term of description which serves only to identify the work, and may be adopted and applied to any other book or trade commodity, provided the person does not use it as a false token to induce the public to believe that the thing to which he has applied it is the identical thing which it originally designated.

[Ed. Note.—For other cases, see Literary Property, Cent. Dig. § 2; Dec. Dig. § 3.*]

**7. COPYRIGHTS (§ 37*)—BOOKS—TITLE.**

The copyright of a book does not prevent others from taking the same title for another book, though the copyright has not expired.

[Ed. Note.—For other cases, see Copyrights, Cent. Dig. § 38; Dec. Dig. § 37.*]

**8. COPYRIGHTS (§ 36*)—EXPIRATION—RIGHTS OF PUBLIC.**

On the expiration of the copyright of a novel, any person may use the plot for a play, copy or publish it, or make any use of it he sees fit; so where one writes and copyrights a play based on a novel, and bearing the same title as the novel, he cannot prevent another from giving the same name to an entirely different play which has been constructed from that novel.

[Ed. Note.—For other cases, see Copyrights, Cent. Dig. § 37; Dec. Dig. § 36.*]

**9. COPYRIGHTS (§ 33*)—EXPIRATION—COPYRIGHTED NAME.**

The right to use a copyrighted name on the expiration of the copyright becomes public property, subject to the limitation that the right be so exercised as not to deceive the public and lead them to believe that they are buying the particular thing which was produced under the copyright.

[Ed. Note.—For other cases, see Copyrights, Dec. Dig. § 33.*]

**10. COPYRIGHTS (§ 36*)—TRANSLATION—DRAMATIZATION—STATUTES.**

Rev. St. § 4952, as amended by Act Cong. March 3, 1891, c. 565, 26 Stat. 1107 (U. S. Comp. St. 1901, p. 3406), providing that authors or their assigns shall have the exclusive right to dramatize and translate any of their works for which copyright shall have been obtained, makes such exclusive right an integral part of the copyright itself.

[Ed. Note.—For other cases, see Copyrights, Cent. Dig. § 37; Dec. Dig. § 36.*]

**11. TRADE-MARKS AND TRADE-NAMES (§ 67*)—UNLAWFUL COMPETITION—PROTECTION.**

The law of unfair trade is to protect the honest trader in the business which fairly belongs to him; to punish the dishonest trader, who is taking his competitor's business by unfair means, and to protect the public from deception.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 78; Dec. Dig. § 67.*

Unfair competition in use of trade-mark or trade-name, see notes to Scheuer v. Miller, 20 C. C. A. 165; Lare v. Harper & Bros., 30 C. C. A. 376.]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

12. TRADE-MARKS AND TRADE-NAMES (§ 61*)—INFRINGEMENT—RIGHT TO RELIEF.

To sustain a charge of infringement of a trade-mark, the owner must have used it on the same class of goods put out by the alleged infringer, but not necessarily on the same species of goods.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 76; Dec. Dig. § 61.*]

13. TRADE-MARKS AND TRADE-NAMES (§ 24*)—NATURE OF RIGHT—CHARACTER OF PROTECTION.

Neither trade-mark nor trade-name can afford protection to detective stories, as such, whether published or still unpublished, and much less where neither title nor composition is pirated, and but a single common character is used by the alleged infringer.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 27; Dec. Dig. § 24.*]

14. LITERARY PROPERTY (§ 4*)—FORMS OF PRODUCTION—MOVING PICTURES—DRAMATIZATION—BOOKS.

Moving pictures and dramatization being cognate forms of production, when the latter is copyrighted, it necessarily includes the former; but in the absence of copyright no such relation exists between either moving pictures or dramatization and a written book relating the same story.

[Ed. Note.—For other cases, see Literary Property, Cent. Dig. § 3; Dec. Dig. § 4.*]

Hook, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Eastern District of Missouri; David P. Dyer, Judge.

Suit by Street & Smith, a copartnership, against the Atlas Manufacturing Company and another. Decree for complainants, and defendants appeal. Reversed, and bill dismissed.

James Love Hopkins and Nelson Thomas, both of St. Louis, Mo., for appellants.

Hugh K. Wagner, of St. Louis, Mo. (Leonard J. Langbein, of New York City, on the brief), for appellees.

Before HOOK and SMITH, Circuit Judges, and VAN VALKENBURGH, District Judge.

VAN VALKENBURGH, District Judge. Appellees, complainants below, are citizens of the state of New York, and are the members of a copartnership known and styled as Street & Smith. This firm is engaged in the business of publishing detective stories characterized by the general name of "Nick Carter." Its publications are issued weekly and consist, exclusive of cover, of 32 pages 11 by 8 inches in size. Of these pages, 26 are devoted to a detective story complete in itself; 5 pages to space-filling items under the heading "News of All Nations"; and 1 page to advertising other publications issued by the same firm. The cover is in colors and presents in order the serial number, date, price, general title "Nick Carter," the specific title of the detective story, as "The Red Button," contained in that issue, and an illustration characteristic of the story, or depicting some incident in it. Slight modifications of interior make-up have since been made, but this description applies to complainants' exhibit, filed with their bill

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

July 1, 1912. The function of the weekly issue is the publication of the single detective story contained therein. A different story under a distinct title is published each week. These stories are complete in themselves. The only connection between them is that the detective character, Nick Carter, is the central figure in each. April 19, 1910, complainants registered the name "Nick Carter" as a trade-mark for "a weekly publication devoted to fiction," alleging that it had been used in their business and that of their predecessors since March 30, 1885.

The appellant Atlas Manufacturing Company is a Missouri corporation domiciled in the city of St. Louis. Its business includes the manufacture and sale of moving-picture films. Appellant Crawford is its president. In January or February, 1912, said Atlas Manufacturing Company employed certain persons, named, respectively, Wolcott and Hamilton, to write a scenario or memorandum of the series of events in a detective story. This story was then acted with appropriate stage setting and the performance photographed in sequence. From these photographs a film was prepared, and it is the purpose of appellants to sell, rent, or lease this film to such persons as may desire to display it in moving-picture theaters. As advertised the story presents "Nick Carter, the Great American Detective, Solving the $100,000.00 Jewel Mystery." It appropriates neither title, plot, nor situations of any story published by complainants. The name Nick Carter is used, and a detective story is portrayed. The name of the appellant corporation, as manufacturer, is displayed upon the screen. Complainants, claiming the "exclusive right to make, sell, print, publish, and display to the public detective stories marked with the name and trade-mark 'Nick Carter' and called and known by the trade-name 'Nick Carter,'" filed their bill of complaint July 1, 1912, to restrain defendants from using this name in any connection or form. A preliminary injunction was granted, and defendants appealed. Complainants have taken out no copyright upon any of their publications. Therefore no rights arising under the copyright law are presented for determination. The property rights asserted are based (1) upon registered trade-mark; (2) upon long-established trade-name.

[1] The trade-mark registered is "Nick Carter." The law authorizing such registration provides that the applicant shall specify "the class of merchandise and the particular description of goods comprised in such class to which the trade-mark is appropriated, * * * a description of the trade-mark itself," and "a statement of the mode in which same is applied and affixed to goods. * * *" Act Feb. 20, 1905, 33 Statutes at Large, pt. 1, c. 592, p. 724 (U. S. Comp. St. Supp. 1911, p. 1459). In compliance with this requirement complainants particularly describe their so-called goods as "a weekly periodical devoted to fiction." To entitle this publication to protection under the trade-mark granted, it must conform to the description filed; it must be a periodical. In Smith et al. v. Hitchcock, 226 U. S. 53, 33 Sup. Ct. 6, 57 L. Ed. ——, decided November 18, 1912, the Supreme Court held that the "Tip Top Weekly," issued by these same complainants, and

practically identical in structure with the "Nick Carter" publication, is not a periodical, but a book.

[2] Literary property in a book cannot be protected by trade-mark, nor otherwise than by copyright. Black v. Ehrich (C. C.) 44 Fed. 793; Brown on Trade-Marks, §§ 116, 117. This is conceded by complainants' counsel in brief and argument; but it is claimed that whether the publication be regarded as a periodical or a book the trade-mark protects it in its character as goods or merchandise. It is therefore well to determine the exact nature of the "merchandise" to which the trade-mark applies. This must be the publication, as such, whether book or periodical. It is the form, not the contents. "Nick Carter" is not the name of the specific story, as, in this case, "The Red Button." None of the individual stories, as such, are covered by the mark. To publish a little booklet entitled "The Red Button," distinct in size, form, and dress, not bearing the imprint "Nick Carter," would not infringe this technical trade-mark. Conceding to this registered mark its broadest application, it can at most protect only against something in the nature of a periodical publication—of the same class.

No exercise of imagination, however fertile, can transform defendants' film or its intermittent exhibitions into anything resembling a periodical publication.

[3] Complainants' chief reliance would seem to be upon the claim asserted in their bill that they have possessed for many years, and still possess, the exclusive right to make, sell, print, publish, and display to the public detective stories called and known by the trade-name "Nick Carter." This is a direct appeal to the law affecting unfair competition in trade. Because they have long published detective stories associated with this name and character, they now assert the exclusive right to construct and make public in any manner whatsoever all detective stories involving the name and character of Nick Carter. It is the individual story as an article of merchandise, and not the form of publication, for which protection is thus invoked. In the language of the brief, "the sole question in this case for the court to decide is whether or not a moving-picture film is of the same class of goods as a printed *book*." The claim advanced is ingenious and decidedly comprehensive in its scope.

[4, 5] We agree with counsel that "the fact that appellees' [complainants'] stories are not the highest class of literature does not bar complainants from relief by the courts." In other words, this fact does not take from the stories their essential character as literature in the eyes of the law. They are subjects of copyright. And this leads us to inquire what complainants' standing would be under the law of copyrights? The author of a literary work or composition has, by common law, the exclusive right to the first publication of it. He has no exclusive right to multiply or control the subsequent issues of copies by others. The right of an author or proprietor of a literary work to multiply copies of it to the exclusion of others is the creature of statute. This is the right secured by the copyright laws of the different governments. Palmer v. De Witt, 47 N. Y. 532, 7 Am. Rep. 480.

[6] "Neither the author nor proprietor of a literary work has any property in its name. It is a term of description, which serves to identify the work; but any other person can, with impunity, adopt it and apply it to any other book, or to any trade commodity, provided he does not use it as a false token to induce the public to believe that the thing to which it is applied is the identical thing which it originally designated. If literary property could be protected under the theory that the name by which it is christened is equivalent to a trade-mark, there would be no necessity for copyright laws." Black v. Ehrich (C. C.) 44 Fed. 793.

[7-9] So the copyright of a book does not prevent others from taking the same title for another book, though the copyright has not expired; and on the expiration of the copyright of a novel any person may use the plot for a play, copy or publish it, or make any other use of it he sees fit. In such case, where one writes and copyrights a play based on a novel, and bearing the same title as the novel, he cannot prevent another from giving the same name to an entirely different play which has been constructed from that novel. Glaser v. St. Elmo Co. (C. C.) 175 Fed. 276. The right to use a copyrighted name upon the expiration of the copyright becomes public property, subject to the limitation that the right be so exercised as not to deceive members of the public and lead them to believe that they are buying the particular thing which was produced under the copyright. G. & C. Merriam Co. v. Ogilvie (C. C. A.) 159 Fed. 638, 88 C. C. A. 596, 16 L. R. A. (N. S.) 549, 14 Ann. Cas. 796.

[10] Original section 4952, R. S. U. S., provided that "authors may reserve the right to dramatize or to translate their own works." Unless this reservation was made, the public was free to make such use of them. By act of March 3, 1891, c. 565, 26 Stat. 1107 (U. S. Comp. St. 1901, p. 3406), it was provided that "authors or their assigns shall have exclusive right to dramatize and translate any of their works for which copyright shall have been obtained under the laws of the United States." This made such exclusive right an integral part of the copyright itself. Under this section, so amended, the Supreme Court has held that an exhibition of a series of photographs of persons and things, arranged on films as moving pictures and so depicting the principal scenes of an author's work as to tell the story, is a dramatization of such work, and the person producing the films and offering them for sale for exhibitions, even if not himself exhibiting them, infringes the copyright of the author. Kalem Co. v. Harper Bros., 222 U. S. 55, 32 Sup. Ct. 20, 56 L. Ed. 92, Ann. Cas. 1913A, 1285. Nevertheless, it is held that the owner of the copyright of a novel is not entitled to protection against the use of that name in connection with a dramatic composition which does not present any scenes, plot, or dialogue imitated or adapted from the novel; it being the name in connection with the novel, and not the name alone, which the copyright protects. Harper et al. v. Ranous (C. C.) 67 Fed. 904. If the copyright has expired, or none has been taken out, neither the rights and privileges conferred, nor the limitations and obligations imposed, by that law are present, because, apart from the statute, none exist.

Complainants do not rely upon copyright. The name "Nick Carter" is not the title of any story, nor the name of author or publisher. But complainants insist that we shall consider their books, not from the literary standpoint, but as merchandise, and cite numerous cases recognizing that the principles of trade-mark law, and the law forbidding unfair competition in business, may, under certain conditions, apply to books, magazines, periodicals, and newspapers. That they may and do apply to magazines, periodicals, and newspapers, as such, we have already seen; to books the application is more limited. The cases cited reveal that protection is accorded in connection with specific kinds of books, such as Bibles, dictionaries, and works of a like nature, where the name has so long been used to designate the production as to have become identified with such particular publications as denoting their origin, and where the use of such name by another publisher, having no connection with the place or name, can have no purpose except to deceive purchasers. Chancellor, etc., of Oxford University v. Wilmore-Andrews Pub. Co. (C. C.) 101 Fed. 443; Merriam Co. v. Straus et al. (C. C.) 136 Fed. 477; Ogilvie v. Merriam Co. (C. C.) 149 Fed. 858; Merriam v. Holloway Pub. Co. (C. C.) 43 Fed. 450; Merriam et al. v. Texas Siftings Pub. Co. (C. C.) 49 Fed. 944; Merriam v. Famous Shoe & Clothing Co. (C. C.) 47 Fed. 411. In instances where the same method of selection, illustration, and style of binding, as well as name on the cover, have been taken, the form of publication is the feature of critical importance. Estes et al. v. Williams et al. (C. C.) 21 Fed. 189; Estes et al. v. Leslie et al. (C. C.) 27 Fed. 22; Estes et al. v. Worthington (C. C.) 31 Fed. 154. In all cases the courts have been careful to limit the doctrine announced to the special circumstances, and have coupled it with a restatement of well-known principles. Thus in Merriam v. Straus et al., supra, Judge Wallace said:

"It is proper, however, to say that the bill is in part an attempt to protect the literary property in the dictionaries, which became publici juris upon the expiration of the copyrights. This attempt must prove futile."

In Ogilvie v. Merriam Co. (C. C.) 149 Fed. 858, it is pointed out that this public right cannot be taken away or abridged on any theory of trade-mark or unfair competition, which is only another way of seeking to perpetuate the monopoly secured by the copyright. Similar views are expressed in Merriam v. Texas Siftings Pub. Co. (C. C.) 49 Fed. 944, and Merriam v. Famous Shoe & Clothing Co. (C. C.) 47 Fed. 411. In G. & C. Merriam v. Ogilvie (C. C. A.) 159 Fed. 638, 88 C. C. A. 596, 16 L. R. A. (N. S.) 549, 14 Ann. Cas. 796, the Court of Appeals for the First Circuit used language still more explicit:

"The name 'Webster' having been copyrighted by the Merriams, they were protected in its use under a statutory right during an expressed term of years. The protection, therefore, in that respect, came by virtue of the copyright, rather than by virtue of its use in publication and trade. The statutory monopoly having expired under statutory limitation, the word 'Webster,' used in connection with a dictionary, became public property, and any relief granted upon the idea of title or proprietorship in the trade-name of 'Webster' would necessarily involve an unwarrantable continuance of the statutory monopoly secured by the copyright."

The important principle involved is, perhaps, most pointedly stated by Mr. Justice Miller in Merriam et al. v. Holloway Pub. Co., supra. He says:

"I want to say, however, with reference to the main issue in the case, that it occurs to me that this proceeding is an attempt to establish the doctrine that a party who has had the copyright of a book until it has expired may continue that monopoly indefinitely, under the pretense that it is protected by a trade-mark, or something of that sort. I do not believe in any such doctrine, nor do my Associates. When a man takes out a copyright for any of his writings or works, he impliedly agrees that at the expiration of that copyright such writings or works shall go to the public and become public property. I may be the first to announce that doctrine, but I announce it without any hesitation. If a man is entitled to an extension of his copyright, he may obtain it by the mode pointed out by law. The law provides a method of obtaining such extension. The copyright law gives an author or proprietor a monopoly of the sale of his writings for a definite period, but the grant of a monopoly implies that after the monopoly has expired the public shall be entitled ever afterwards to the unrestricted use of the book. * * * I will say this, however: That the contention that complainants have any special property in 'Webster's Dictionary' is all nonsense, since the copyright has expired. What do they mean by the expression 'their book,' when they speak of Webster's Dictionary? It may be their book if they have bought it, as a copy of Webster's Dictionary is my book if I have bought it. But in no other sense than that last indicated can the complainants say of Webster's Dictionary that it is their book."

In the Chatterbox Cases (Estes v. Williams, supra, Estes v. Leslie, supra, and Estes v. Worthington, supra) emphasis is laid chiefly upon similarity of form. In Estes et al. v. Williams et al., supra, it was said:

"There is no question but that the defendants have the right to reprint the compositions and illustrations contained in these books, including the titles of the several pieces and pictures. That does not settle the question as to the right claimed here. There is work in these publications aside from the ideas and conceptions. Johnston was not the writer of the articles nor the designer of the pictures composing the books, but he brought them out in this form. The name indicates this work. The defendants, by putting this name to their work in bringing out the same style of book, indicate that their work is his. This renders his book less remunerative, and while continued is a continuing injury which it is the peculiar province of a court of equity to prevent."

In Kalem Co. v. Harper Bros., 222 U. S. 55, 32 Sup. Ct. 20, 56 L. Ed. 92, Ann. Cas. 1913A, 1285, it was suggested by counsel that to extend the copyright to a case of reproducing scenes from Ben Hur by means of moving pictures was to extend it to the ideas as distinguished from the words in which those ideas are clothed. Mr. Justice Holmes said:

"But there is no attempt to make a monopoly of the ideas expressed. The law confines itself to a particular, cognate, and well-known form of production."

[11, 12] It may be conceded: That the law relating to unfair trade has a threefold object: First, to protect the honest trader in the business which fairly belongs to him; second, to punish the dishonest trader, who is taking his competitor's business away by unfair means; third, to protect the public from deception. Gulden v. Chance (C. C. A.) 182 Fed. 303, 105 C. C. A. 16. That to sustain a charge of

infringement the owner of a trade-mark must have used it on the same class, but not necessarily on the same species, of goods as the alleged infringer. Layton Pure Food Co. v. Church & Dwight Co. (C. C. A.) 182 Fed. 35, 104 C. C. A. 475, 32 L. R. A. (N. S.) 274. Of course, defendants' film bears no resemblance to complainants' books. No one would buy the one in the belief that he was getting the other. It is the display that constitutes the infringement, if there is one; and in such case the producer of the film is responsible equally with the exhibitor. Kalem Co. v. Harper Bros., supra. We do not think a moving-picture show is of the same class as a written book. One belongs to the field of literature; the other to the domain of theatricals. Originally there was no legal connection between the written novel and a dramatization based upon its characters and incidents. The connection was made by statute in derogation of the common law. In the absence of copyright, the situation is as if no such connection had ever been made. We are unwilling, indirectly, to extend to writings a protection beyond that conferred by statute. Congress created a specific form of monopoly for literary property in this country, and made it subject to express limitations. It is for Congress to say whether these limitations should be relaxed.

[13] Neither trade-mark nor trade-name can afford protection to detective stories, as such, whether published or still unborn, and much less where neither title nor composition is pirated, and but a single common character is used. The suggestion involves an attempt to make a monopoly of ideas, instead of confining the application of the law to "a particular cognate and well-known form of production."

[14] Moving pictures and dramatizations are cognate forms of production. When copyright was extended to the latter, it necessarily included the former; but in the absence of copyright no such relation exists between either of these forms and the written book. It is not thought that the public will be deceived into belief that it is seeing a reproduction of one of complainants' stories when it witnesses that displayed from defendants' film. But if so it is no more deceived than when it reads a book of the same name as one theretofore published, but unprotected. It may be that the defendants are profiting by the use of a name made distinctive by complainants, but this is true of one who sells a brand of cigars named after a famous book or a famous personage. In the absence of some positive legal right in complainants, these are conditions for which equity cannot undertake to create a remedy. The decree below must therefore be reversed and the case remanded, with directions that the preliminary injunction be dissolved and the bill dismissed for want of equity. Mast, Foos & Co. v. Stover Manufacturing Co., 177 U. S. 485, 20 Sup. Ct. 708, 44 L. Ed. 856; Castner v. Coffman, 178 U. S. 168, 20 Sup. Ct. 842, 44 L. Ed. 1021.

It is so ordered.

HOOK, Circuit Judge (dissenting). My objection to the above conclusion can be expressed in a sentence: The defendants are engaged in appropriating the fruits of complainants' current endeavors, and are deceiving the public.