## NIEMAN v. PLOUGH CHEMICAL CO.

Circuit Court of Appeals, Sixth Circuit.
October 14, 1927.

No. 4784.

**1. Trade-marks and trade-names and unfair competition ⊙32—Abandonment of trademark is question of intent.**

The question of abandonment of trade-mark is one of intent.

**2. Depositions ⊙50—That deposition is taken before notary other than named in notice does not render it inadmissible (28 USCA § 639).**

Under Rev. St. § 863 (28 USCA § 639 [Comp. St. § 1472]), the fact that a deposition is taken before a notary other than the one named in the notice does not render it inadmissible.

**3. Depositions ⊙56(1)—Notice of taking deposition need not state reason for such taking (28 USCA § 639).**

Under Rev. St. § 863 (28 USCA § 639 [Comp. St. § 1472]), requiring notice of taking of deposition to name the witness, and the time and place of taking, it is not necessary for notice to state the reason why the deposition is being taken.

**4. Depositions ⊙69—Depositions taken on two successive days held not inadmissible, though not subscribed and sworn to until third day (28 USCA § 639).**

Under Rev. St. § 863 (28 USCA § 639 [Comp. St. § 1472]), depositions taken on two successive days are not inadmissible, because not subscribed and sworn to until the third day.

**5. Depositions ⊙76—Deposition held not inadmissible because it did not have final certificate required by statute attached to it when forwarded to clerk (28 USCA §§ 639, 641).**

That final certificate required by Rev. St. § 865 (28 USCA § 641 [Comp. St. § 1474]), was not attached to deposition taken under Rev. St. § 863 (28 USCA § 639 [Comp. St. § 1472]), when it was forwarded to and received by the clerk of court, *held* not to render the deposition inadmissible, where certificate was immediately thereafter forwarded, and promptly received by the clerk.

**6. Courts ⊙350—Under statute, taking of deposition is not controlled by state statutes (equity rule 54; 28 USCA §§ 639, 643; Conformity Act [28 USCA § 724]).**

Under Rev. St. § 863 (28 USCA § 639 [Comp. St. § 1472]), and equity rule 54, state statutes do not control the taking of depositions, notwithstanding Conformity Act, Rev. St. § 914 (28 USCA § 724 [Comp. St. § 1537]), or Act March 9, 1892 (28 USCA § 643 [Comp. St. § 1476]), which merely permits depositions to be taken in the mode prescribed by state laws.

**7. Depositions ⊙78—Irregularity in manner of transmitting depositions to court held such as should be disregarded under statute (Judicial Code, § 269 [28 USCA § 391]).**

Failure of notary to observe strictly and literally the requirements of Rev. St. § 865 (28 USCA § 641 [Comp. St. § 1474]), with respect to the method of transmitting depositions to the court *held* an irregularity, which should be disregarded, under Judicial Code, § 269, as amended by Act Feb. 26, 1919 (28 USCA § 391 [Comp. St. § 1246]).

**8. Trade-marks and trade-names and unfair competition ⊙61—"Black and White Series," as trade-mark for dream book and dictionary, held not infringed by use of similar words on toilet articles and advertising almanac.**

"Black and White Series," as trade-mark for dream book and dream dictionary, *held* not infringed by use of the words "Black and White" as a trade-mark for patent medicines, chemicals, and toilet articles, or by such manufacturer's use of the words "Black and White Birthday and Dream Book," as title for almanac published annually for the purpose of advertising his products.

**9. Trade-marks and trade-names and unfair competition ⊙61—To establish infringement of trade-mark, owner must show use on same class of goods as put out by alleged infringer, though not necessarily on same species of goods.**

To sustain a charge of infringement of a trade-mark, the owner must have used it on the same class of goods put out by the alleged infringer, though not necessarily on the same species of goods.

**10. Trade-marks and trade-names and unfair competition ⊙67—Lawful publication and distribution of Birthday and Dream Book Almanac, causing falling off of sales of another Dream Book, gives no right to damages.**

The mere fact that lawful publication and distribution of a Black and White Birthday and Dream Book Almanac caused a falling off in the sale of Dream Book and Dream Dictionary, published as part of "Black and White Series," gives no ground for legal or equitable relief.

Appeal from the District Court of the United States for the Western Division of the Southern District of Ohio; Smith Hickenlooper, Judge.

Suit by the Plough Chemical Company against Eva Nieman, wherein defendant filed a counterclaim for damages for alleged infringement of registered trade-mark. From a decree dismissing the complaint, and denying defendant recovery on the counterclaim, defendant appeals. Affirmed.

James N. Ramsey, of Cincinnati, Ohio, for appellant.

John C. Carpenter, of Chicago, Ill., and J. W. Canada, of Memphis, Tenn. (Munday, Clarke & Carpenter, of Chicago, Ill., and W. R. Wood, of Cincinnati, Ohio, on the brief), for appellee.

Before DENISON, MOORMAN, and KNAPPEN, Circuit Judges.

KNAPPEN, Circuit Judge. This controversy concerns the rights of the respective parties to the use of the trade-mark or trade-name "Black and White," as severally used by them.

On February 18, 1921, appellant applied for registration of a trade-mark "Black and White" for printed books and pamphlets in series (the first stated use thereof being February 1, 1921), and certificate of registration No. 148,495 was granted her November 15, 1921. On August 25 of that year appellee applied for registration of an alleged trade-mark "Black and White" for books, later amended to read "Black and White for books, namely, almanacs, issued annually, Birthday and Dream Books." An interference (No. 47,897) was declared between appellant's registered trade-mark and appellee's application. The examiner, the Commissioner of Patents, and the Court of Appeals of the District of Columbia having successively held that appellee was not entitled to registration of its mark, the bill in this cause was filed by appellee under section 4915 of the Revised Statutes (U. S. C. S. 1916, § 9460 [35 USCA § 63]),[1] praying decree declaring its right to registration and directing issue of certificate thereof. Defendant answered, denying appellee's asserted right to registration, and counterclaimed for infringement of her registered trade-mark, asserting unfair competition with respect to her earlier common-law rights. Upon final hearing on pleadings and proofs, the District Court found that plaintiff had not sustained the burden of showing priority of right to use the words "Black and White Series" on almanacs, dream books, etc. The court also held that plaintiff appellee had not infringed appellant's statutory trade-mark nor her common-law trade-mark or trade-name.[2] The bill of complaint was accordingly dismissed, as was defendant's counterclaim upon both branches. Plaintiff did not appeal. This review is had upon defendant's appeal from dismissal of her counterclaim.

As early as 1900 (apparently in 1902 or 1903), Hennegan & Co., printers and lithographers at Cincinnati, Ohio, began publishing a pamphlet called "Black and White Dream Book," of an issue bearing a publication date 1900; about one-half was devoted to the "True Interpretation of Dreams" (the subjects of such dreams being alphabetically arranged), the remainder of the pamphlet being almost entirely given up to the subjects of "palmistry," "fortune telling," "curious games of cards," "Moles," "telling fortunes by grounds of a tea and coffee cup," and "signs and omens." The pamphlet carried no advertisements and bore Hennegan's imprint. The book took its name from the fact that it was originally put out as "show printing" for one Boone, a "mind reader and hypnotist," calling himself a "Mahatma," one of whose "color schemes" (applied to show printing, costumes, and horses used in one of his acts) was black and white. Its subject-matter was in large part in the language used in "The Gypsy Fortune Teller Dream Book and Treasury of Lucky Numbers," by "Madam Juno, the Gypsy Queen," apparently published in 1887. The "Dream Book" was sold by Boone, and after his death by showmen of the same general type, including Galvani and Madame Frimie, during performances in opera houses and tents.

Until 1912 books of this character were also sold by Hennegan to promoters of mail order business generally. From 1912 to 1919, at least, that company sold the old "Black and White Dream Book" (1900) in large quantities to appellant exclusively, but still under the Hennegan imprint; and from 1919 to 1921 printed in the name of the Van Publishing Company, Cincinnati, of which appellant was proprietor, a "Dream Dictionary," containing in principal substance the "Dream Interpretations" published in the old Black and White Dream Book, but omitting the other features hereafter enumerated. This "Dream Dictionary" of 1919 to 1921 did not purport to be a Black and White publication, nor did it contain the words "Black and White." Presumably such trade-mark rights as appellant had derived from Hennegan were not intended by appellant to be abandoned. In 1921 Hennegan printed in the name of the Van Publishing Company a series of six volumes, viz.: (1) A "Dream Dictionary," which was almost entirely a reprint (with exceptions hereafter mentioned) of the Dream Dictionary before referred to as printed from 1919 to 1921; (2) "Marriage" (Nos. 1 and 2 had been prepared between 1919 and 1921); (3) "What is in Your Life;" (4) "The Little Wonder Fortune Teller;" (5) "Character Reading;" and (6) "Magnetism." All six of these volumes so

---

[1] Which is held to apply to trade-marks as well as to patents. American Foundries v. Robertson, 262 U. S. 209, 43 S. Ct. 541, 67 L. Ed. 953.

[2] The result of the decision, as the court explained it, is that both may go ahead and use "Black and White" in connection with their own businesses. Miss Nieman can use Black and White Series, and the Plough Chemical Company can use the Black and White Dream Book, so long as they show it is Plough's and not Nieman's.

put out in 1921 were marked "Black and White Series" at the top of both front and back pages, the volumes being in both places numbered respectively, from 1 to 6. They carried no advertisements, except one of a so-called "Wizard Fortune Wheel" put out by appellant. Hennegan's Black and White Dream Book had carried no advertisements. These six "Black and White Series" volumes were continuously published from 1921.

Meanwhile, in 1917, and thus before the first publication by appellant of a "Black and White Series," under that imprint, appellee, whose business was that of a manufacturing chemist and manufacturer of toilet preparations, proprietary medicines and food products, adopted and began to use the label (and alleged trade-name) "Black and White" on its line of medicinal and toilet articles, and possibly other lines, which label it has since continuously used.

In 1919 appellee, as part of an advertising system for the sale of its products, began putting out paper pamphlets, such as "almanacs and dream books," etc., which it sent to its customers in large quantities, and which the latter could give away or sell, as they might prefer—a price of 25 cents being marked on the pamphlet. In 1923, and thus six years after appellee began the use of its trade-name "Black and White" as applied to its line of manufactured products, and four years after appellee's publications began, Hennegan & Co. gave appellant a written assignment of the trade-mark (or trade-name) "Black and White." Hennegan & Co. had no registered trade-mark.

Appellant asserts that Hennegan & Co. actually sold her the trade-mark when she bought the goods purchased in 1912. The trial judge, who saw and heard nearly all the witnesses, including appellant, found that "no such assignment was in fact made until the written assignment, which is 1923." The judge considered that appellant's use was simply that she bought the 100,000 or less of these Black and White Dream Books,[3] and disposed of them, and that at that time she had no idea of establishing a trade-mark, and that, in his opinion, she could not in fact have established such trade-mark, because the use was neither indicative of excellence of selection, high quality of printing, or any other attribute which she had or which she exercised, as distinguished from the uncopyrighted contents of the book.

Appellee, not having appealed from the decision of the court below, denying its asserted right over appellant to use the words

"Black and White" as applied to a series of books, is bound by that decision, and, in the view we take of the question of infringement, we find it unnecessary to determine whether appellant bought Hennegan's trade-mark in 1912.[4]

1. Appellee contends that appellant was anticipated by Harper & Bros. in the use of the trade-mark "Black and White," as applied to their well and widely known series of books published under the trade-name "Black and White Series" (the series seems at one time to have included about 23 titles), which trade-mark or trade-name was purchased by appellee May 22, 1924, during the pendency of the trade-mark interference proceedings between appellant and appellee.

The court below, while of opinion that appellee gained by such purchase no right superior to Nieman's to the ownership or registration of this alleged trade-mark, expressed the opinion that there was sufficient evidence to convince the court of the fact of anticipation on the part of Harper & Bros., and that their common-law trade-mark was still in existence and still active, and still representative of some good will, at the time the registration was granted to Nieman, and that for that reason, among others, appellee had not infringed appellant's alleged trade-mark. We see no inconsistency between the failure to recognize the Harper use as available to appellee in support of *its* attempted trade-mark registration, and the conclusion that the defense of such Harper use was available as against a charge of infringement.[5] If the

---

[3] Paying one cent apiece for them.

[4] The statutory registration of appellant's trade-mark is not res judicata, but is merely prima facie evidence of ownership. U. S. C. S. 1916, § 9501 (15 USCA § 96). But while the question of priority is still open, notwithstanding the concurrent findings of all the Patent Office Tribunals, including the Court of Appeals of the District of Columbia, yet, in view of the weight which justly attaches to the decisions of the Patent Office, they are accepted by the courts as controlling upon the question of priority in any subsequent suit between the same parties, unless the contrary is established by testimony which in character and amount carries thorough conviction. Morgan v. Daniels, 153 U. S. 120, 14 S. Ct. 772, 38 L. Ed. 657; Clements v. Kirby (C. C. A. 6) 274 F. 575, 586; Greenwood v. Dover (C. C. A. 1) 194 F. 91, 95; Victor v. Brunswick-Balke Co. (C. C. A. 3) 8 F.(2d) 41; Earles v. Drake (C. C. A. 3) 300 F. 265–267; De Forest v. Westinghouse (D. C.) 13 F.(2d) 1014, 1017; Curtiss v. Janin (C. C. A. 2) 278 F. 454.

[5] Harper's application for registration of trade-mark having been since the sale to appellee put in interference with appellant's registration, the Patent Office has, since the decision of the instant case below, held that Harper & Bros. are not entitled to the registration ap-

trial court's conclusion of fact is right, its conclusion of law would seem to follow.

[1] If the testimony of the witness Lewin, taken by appellee under the federal statute relating to depositions de bene esse, was properly in evidence, we think the record supports a conclusion that the Harper use of the trademark "Black and White Series" began in 1885 (as recited in the assignment to appellee), and was still active and still representative of substantial good will at the time of Harper's sale to appellee in 1924. The witness Lewin, who when his deposition was taken[6] (February, 1926), was organization manager of Harper & Bros., and had been continuously associated with that house for 39 years, testified, in substance, that the Black and White Series started originally with "just a single volume [title?] of the series, or perhaps one or two in the series, and then we have added from time to time various titles" thereto; that Howell's "The Garroters" formed a part of this series in 1885; that the series was continuous; that the first edition of "The Garroters" was published in 1885, and the last edition in 1917; that in the case of three other titles editions have been published as late as 1922, and that all four of the titles mentioned were, when the deposition was taken, still in the live, active files of the Harper house and open to sale to an applying purchaser. A witness testified to the purchase from different booksellers, in different locations, in 1925, of several different books of Harper's "Black & White Series"— 30 or 40 copies in all. To say the least, the question of abandonment of the Harper trade-mark was one of intent. Baglin v. Cusenier, 221 U. S. 580, 597 et seq., 31 S. Ct. 669, 55 L. Ed. 863. Saxlehner v. Eisner, 179 U. S. 19, 31, 21 S. Ct. 7, 45 L. Ed. 60.

[2-7] The deposition in question was taken under Revised Statutes, § 863 (U. S. C. S. § 1472 [28 USCA § 639]) which relates to the taking of testimony de bene esse, of witnesses (as applied to this case) residing more than 100 miles from the place of trial.[7] The

regularity of the taking and return of Lewin's deposition is important; we doubt whether without it the record carries the Harper use back far enough to anticipate that of appellant. We find nothing in the record which, to our minds, renders the deposition inadmissible.[8]

ment of the statute that the notice give the "name of the witness." See In re Automobile Cooperative Ass'n, etc. (D. C.) 222 F. 345, 346. We accordingly disregard the testimony of that witness.

[8] The fact that it was taken before a notary other than the one named in the notice is, we think, not important especially in view of the statement of counsel, at the time the deposition was taken, that because of court engagements the reporter had been changed. The statute does not require that the name of the officer before whom depositions are proposed to be taken shall be stated in the notice. Cf. Gormley v. Bunyan, 138 U. S. 623, 632, 11 S. Ct. 453, 34 L. Ed. 1086. The examination was taken at the place named in the notice, on the next day after the date given therein, and on which date so given the deposition of the other witness had been taken before a notary other than stated in the notice; it being then and there stated that the witness Lewin was ill and would be unable to attend that day. The witness having testified to his residence at a named place in New Jersey, it will be presumed that he continued to live there at the time of trial, and no further proof on that subject need be offered in the absence of proof to the contrary. Whitford v. Clark County, 119 U. S. 522, 7 S. Ct. 306, 30 L. Ed. 500. The statute does not require that the notice give the residence of the witness. It requires merely the "name of the witness and the time and place of the taking of his deposition." We do not understand appellant to raise any question on that score, nor respecting the absence from the notice of the statement that the reason for taking the deposition of the witness is that he resides more than 100 miles from the place of the trial. This manifestly constitutes no defect. The statute des not require the reason to be given. De Butts v. McCulloch, Fed. Cas. No. 3,718, 1 Cranch C. C. 286. Indeed, the giving of his name, and, the implication from the notice that he was an employee of Harper & Bros., furnished adequate opportunity for ascertaining whether or not he lived more than 100 miles from the place of trial. It is not important whether or not the trial court refused to grant permission to take the depositions, and set the case for hearing at an early date after the time the depositions were noticed to be taken. While we do not so construe the record, it is enough to say that the court would have had no right to prevent resort to the statute in question. Kline v. Insurance Co., 184 F. (C. C.) 969; In re National Equipment Co. (C. C. A. 2,) 195 F. 488, 489. Nor do we see any discrepancy between the date of taking the depositions (February 17 and 18) and the fact that the depositions were subscribed and sworn to on February 19th. The statute does not provide that the depositions be subscribed and sworn to at the time the testimony is given; indeed, that would be frequently impracticable. The caption to the

plied for, apparently in part at least, in view of the fact that it appears by the application that appellee is the interested party therein, and not Harper & Bros. It does not appear that any proceeding has since been taken under that application.

[6] Appellant was not present or represented at the taking of the deposition, although counsel was seasonably notified in writing.

[7] The notice of the taking of the depositions gave the names of the witnesses as "John M. Lewin and possibly other employees of Harper & Bros." Under this notice, the deposition of an additional witness was taken. We doubt whether this was proper, in view of the require-

[8] 2. But even if the asserted Harper prior use be wholly disregarded, and assuming, for the purposes of this opinion, that appellant's registered trade-mark is valid, and that the District Court had jurisdiction over the subject-matter of appellee's counterclaim as applied to appellant's trade-mark, we think appellee has not infringed.

Whether the common-law trade-mark in a "Black and White Dream Book," sold by appellant under Hennegan's imprint from 1912 until 1919, belonged to Hennegan or appellant, appellee had equally the right to adopt and use the registered trade-mark "Black and White" for its maufactures of patent medicines, chemical and toilet articles, etc.—all of which were in a different class from "Dream Books"—and to advertise its manufactures accordingly. We have no doubt of the validity of appellee's common-law trade-mark "Black and White" as so applied.[9] This, however, involves no necessary conflict between appellant's registered trade-mark "Black and White Series," or "Black and White," as applied to her series of pamphlets, and, on the other hand, appellee's trade-mark "Black and White," as applied to its medicines and toilet preparations. In 1921 appellant was not new in the field with a "Dream Book" or "Dream Dictionary." She had published no almanac. As testified by her witness, there is a large number of various "Dream Books" and "Dream Dictionaries" put out to the public.

The question of infringement turns upon the fact whether appellee has used its own trade-mark in such manner that casual and unwary purchasers of average intelligence were, or were likely to be, deceived into the belief that appellee's publications were put out by appellant. 26 R. C. L. title "Trademarks," § 51; McLean v. Fleming, 96 U. S. 245, 251 et seq., 24 L. Ed. 828; Hutchinson v. Loewy (C. C. A. 2) 163 F. 42; Werk v. Grosberg (C. C. A. 6) 250 F. 968; Hercules v. Newton (C. C. A. 2) 266 F. 169, 174; Rathbone v. Champion Co. (C. C. A. 6) 189 F. 26, 30, 37 L. R. A. (N. S.) 258; "The en-

---

deposition of the witness in question recites that he was duly sworn before testifying. The jurat at the close of the deposition, to the effect that it was subscribed and sworn to on the 19th day of February, would naturally mean that it was signed and again sworn to after it had been written up by the notary.

We find no further criticism requiring mention, except as based upon the fact that the final certificate required by Revised Statutes, § 865 (U. S. C. S. 1916) § 1474 [28 USCA § 641]), was not attached to the deposition when it was forwarded to and received by the clerk of the court. It was, however, immediately forwarded, and was promptly received thereafter. It, we think, sufficiently prima facie identified the deposition to which it related, and, in the absence of anything to the contrary, we think it might lawfully have been attached by the clerk to the deposition itself, which apparently contemplated attachment thereto of the notice of taking depositions, or might properly, under an order of the court, have been returned by the clerk to the notary for attachment of certificate thereto.

The trial court expressed the view that the federal statute in effect required that the deposition be taken under the Ohio statutory procedure; and, inasmuch as the depositions were not returned in accordance therewith, they could not be received. The court, however, admitted the depositions in evidence, so as to bring the question before this court. We are unable to agree with this view of the statute. Revised Statutes, § 863, in question, not only contains no provision to the effect just stated, but equity rule 54 expressly provides for taking depositions under section 863. Moreover, Act March 9, 1892, c. 14 (U. S. C. S. 1916, § 1476 [28 USCA § 643]), merely *permits* depositions to be taken in the mode prescribed by the state laws. Nor, in our judgment, does the Conformity Act (Rev. Stat. § 914 [U. S. C. S. 1916, § 1537; 28 USCA § 724) have application. It has been expressly held that the act does not apply to the signing or taking of depositions to be used in the federal courts under Rev. Stats. §§ 863–865 (28 USCA §§ 639–641); Sage v. Tauszky (C. C. S. D. Ohio) Fed. Cas. No. 12,214. See, also, the opinion of District Judge (later Mr. Justice) Brown in United States v. 50 Boxes Etc. (D. C.) 92 F. 601, 602, and cases there cited; also Hanks Dental Ass'n v. Tooth Crown Co., 194 U. S. 303, 305 et seq. 24 S. Ct. 700, 48 L. Ed. 989. Cf. Knight v. Illinois Central R. R. Co. (C. C. A. 6) 180 F. 368.

We may add that the depositions in question, which relate to defendant's counterclaim, were taken within the period after issue joined thereon allowed by general equity rule No. 47, under which, we think, appellee must be regarded, as respects the counterclaim, as a defendant. The notice in question stated that the depositions were to be taken in the matter of appellant's counterclaim. It may also be noted that appellant's counsel conceded in the District Court that two witnesses named by appellee's counsel, if called, would testify that the notaries in question were not of counsel nor kin to any of the parties and had no interest in the case.

It satisfactorily appearing that the notary's

---

failure to observe strictly and literally the terms of the statute (R. S. § 865) with respect to the method of transmitting the depositions to the court has caused no injury or prejudice to appellant, we think the irregularity should be disregarded under section 269 of the Judicial Code, as amended by Act Feb. 26, 1919 (28 USCA § 391 [Comp. St. § 1246]).

[9] American Steel Foundries v. Robertson, 269 U. S. 372, 380, 46 S. Ct. 160, 70 L. Ed. 317, and cases there cited. On July 22, 1924, after the Commissioner's denial of appellee's application for registration of its alleged trade-mark, "Black and White," as applied to a series of books, in interference with appellant's registered trade-mark, he allowed appellee, as assignee of Moore & Co., a trade-mark "Black and White" as applied to hand soap.

tire substantive law of trade-marks (excepting statutory provisions and construction) is a branch of the broader law of unfair competition. The ultimate offense always is that defendant has passed off its goods as and for those of complainant." Merriman v. Saalfield (C. C. A. 6) 198 F. 369, 372; and cases there cited; Hanover v. Allen (C. C. A. 7) 208 F. 513, L. R. A. 1916D, 136; Howe v. Wyckoff, 198 U. S. 118, 140, 25 S. Ct. 609, 49 L. Ed. 972; Hanover v. Metcalf, 240 U. S. 403, 413, 36 S. Ct. 357, 58 L. Ed. 468; cf. DeVoe v. Wolff (C. C. A. 6) 206 F. 420, 423. The fact that appellant's trade-mark is registered works no change in this rule. Nashville Co. v. Coco Cola Co. (C. C. A. 6) 215 F. 527, 529, Ann. Cas. 1915B, 358; Gaines v. Distilling Co. (C. C. A. 6) 226 F. 531, 541, reversed on another point, 246 U. S. 312, 38 S. Ct. 327, 62 L. Ed. 738, cf. Delaware & Hudson Canal Co. v. Clark, 13 Wall. 311, 323, 20 L. Ed. 581.

We think appellant has no ground to complain that appellee has appropriated any literary property of appellant. Atlas v. Street (C. C. A. 8) 204 F. 398, 402, 47 L. R. A. (N. S.) 1002. Appellee's alleged infringing publications are:

(1) "Plough's Black and White Almanac," the issues before us being respectively for the years 1920, 1922, 1923, 1925, and 1926,[10] each entitled on its face "Plough's Black and White Almanac" for the then current year, that for 1920 bearing on its face the legend "Copyright applied for," etc, that for 1922 bearing the additional words "Interesting information, astrological data, reliable calendar, weather forecast," and those for 1925 and 1926 the words "and Beauty Book," following the words "Plough's Black and White 1925 (or 1926) Almanac."

[9] Appellee had the right to use the trade-mark "Black and White" as applied to its goods. Appellant had no such right and no such goods. It had only the right (which appellee did not have) to use the trade-mark as applied to a series of books. At the head of each cover page of each of appellant's books of that series were the words "Black and White Series." Appellee's books nowhere contained any reference to a series. To sustain a charge of infringement of a trade-mark the owner must have used it on the same class of goods put out by the alleged infringer, but not necessarily on the same species of goods. Atlas v. Street, supra. Each of these almanacs is, we think, on its face plainly put

out as an advertisement of appellee's manufactures of toilet articles, chemical and medicinal preparations.[11] Each contains numerous and frequent advertisements of appellee's manufactures; its almanacs contain also monthly calendars, weather forecasts, zodiacal signs, and other features of the general character found in medical almanacs for more than fifty years past.

(2) Appellee's "Black and White Birthday and Dream Book," each of the two issues of which carries on its front cover the name above given, the first issue (1919 or 1920), bearing also on the front cover the words "The twelve monthly birthday readings for the year, the true meaning of your dreams, daily guide for business and pleasure for 1920, price 25 cents. Copyright applied for," and on the back cover a full-page advertisement of "Plough Chemical Company, Manufacturing Chemists, Memphis, Tenn."; the second issue (1921 to 1922) carrying on its front cover the words "Plough's Black and White Birthday and Dream Book," followed by the imprint, in the form of a seal, reading "Plough's Black and White Toilet Preparations, the symbol of excellence in toilet preparations," also the name and address of "Plough Chemical Company, Memphis, Tenn., U. S. A.," the back cover page being devoted exclusively to a greatly enlarged copy of the imprint in seal form already mentioned. In addition to advertisements of Plough's manufactures on nearly every page, the first issue contains a "Daily astro guide" for 1920, birthday readings for each month in succession, the daily guide for business and pleasure referred to, one page being devoted to the "true meaning of your dreams," some of which are the same as in Hennegan's "Black and White Dream Book," whose origin has already been referred to. The general character of the contents of the second issue does not differ materially from that of the first.

(3) In some other publications by appellee there was included information which we think contains nothing more significant than the publications already described. These include "The Story of Your Face and Its Meaning to Others," embracing (on its first page) a price list of appellee's manufactures, later, "What Different Eyes Indicate," "Reading Character by the Color of the Eyes," "Disposition by the Shape of the Nose," "Reading Character by the Form of the Lips," "Read-

---

[10] The almanac issues for 1921 and 1924, if introduced, presumably did not differ materially from those above named.

[11] It should be unnecessary to say that merely placing appellee's name on its pamphlets would not be enough to defeat a charge of infringement.

ing Character by the Shape of the Ear," and we think show clearly to the most casual observer, from the first page to the last, that it is merely an advertisement of appellee's manufactures. The same thing is, we think, equally true of appellee's song book, published in 1920, which contains numerous prominently displayed advertisements of appellee's various manufactures. Appellee's seal is therein represented, printed one-half in white letters on a black background, the other half in black letters on a white background (in connection with different of appellee's manufactures), as was the case in the Moore Black and White trade-name for soap purchased by appellee. This trade-name and seal is prominent and distinctive. These various publications seem to consist of about 40 per cent. advertisements and about 60 per cent. other reading matter. As respects none of appellee's publications do we think even casual and unwary readers of average intelligence were liable to be deceived into the belief. that they were put out by appellant, or that appellee has in any way palmed off its advertising matter as part of appellant's Black and White Series of books, etc. So far as concerns dress, we see an entire absence of reasonable room for confusion. We are cited to no testimony that any one has been deceived into interpreting any of appellee's publications as those of appellant.

Appellant's brief refers to alleged copyright infringement. That subject requires little attention. There is no evidence that the 1900 Black and White Dream Book was copyrighted. Hennegan thinks it was not. That leaves for consideration only appellant's six volumes of the "Black and White Series." We doubt whether the District Court had jurisdiction, under the counterclaim, over that subject (or whether it was intended by appellant to consider it), except as involved in the general subject of unfair competition. However, in view of the earlier publications referred to, we find nothing in the last-mentioned volumes sufficiently new and material to call for copyright relief.

Of the claim that appellee substantially copied into its 1922 almanac a paragraph of 10 or 11 lines found in appellant's "Dream Dictionary" under the heading "Philosophy of Dreams," it seems sufficient to say that it cannot alter the conclusion of lack of trademark infringement or unfair competition.

The criticism upon the caption on the inside cover of appellee's Black and White Dream Book impresses us as without merit. [10] We cannot construe the evidence—claimed as tending to show a falling off of appellant's sales more or less coincidental with appellee's advertising—as any evidence of misleading on appellee's part. The mere fact, if it be such, that appellee's lawful pamphlet advertisements (owing to their being in many cases given away or otherwise) have lessened the demand for appellant's publications presents no legal or equitable grievance.

We have not discussed all the errors assigned, but we have considered all, and find no reversible error. The rejected stipulation as to testimony has been considered by us. If the views herein expressed are correct, it seems clear that appellant is not entitled to complain of infringement of its trade-mark, or unfair competition with reference to it.

It results, we think, from what we have said, that appellant is entitled to no relief. It follows that the decree of the District Court must be affirmed.