## INTERNATIONAL FILM SERVICE CO., Inc., v. ASSOCIATED PRODUC-ERS, Inc.

### (District Court, S. D. New York. June 9, 1921.)

1. **Trade-marks and trade-names and unfair competition ⬿68—When unfair competition in use of photoplay title established stated.**

    The title of a photoplay, if not strictly descriptive, is at least suggestive, and not arbitrary, and in a suit for unfair competition in its use plaintiff succeeds as soon as he shows an audience educated to understand that the title means his play.

2. **Trade-marks and trade-names and unfair competition ⬿93(1)—Presumption that story had many readers, of whom substantial part remembered title.**

    In a suit for unfair competition in the use of a title for a photoplay, first used as the title of a story on, which plaintiff's play is based, the story published 15 years ago in a magazine of wide circulation presumptively had many readers, of whom a substantial number remember the title; but the presumption is an extremely doubtful inference, and will not warrant a preliminary injunction when the same title has been twice used in other photoplays since the publication of the story.

3. **Trade-marks and trade-names and unfair competition ⬿93(1)—Presumptions can help plaintiff's establishment of case only as they give ground for inference, in absence of facts.**

    In a suit to enjoin unfair competition in the use of a title for a photoplay, presumptions can only help plaintiff to prove a case as they give ground for an honest inference, in the absence of adequate information.

4. **Trade-marks and trade-names and unfair competition ⬿93(1)—Presumption that many people saw photoplays having same name as that sought to be protected.**

    In a suit to enjoin unfair competition in the use of a title for a photoplay, where the court must act upon presumptions, it must be presumed that many people saw plays previously produced under the same title.

5. **Trade-marks and trade-names and unfair competition ⬿95(1)—Preliminary injunction against use of photoplay title not granted because of two exhibitions.**

    Where, since the publication of the story on which plaintiff's photoplay was based, the title has been twice used by other photoplays, a preliminary injunction cannot rest on speculation that people who saw two exhibitions of plaintiff's play may recommend it to others, who may go to defendant's play supposing it to be the one recommended.

6. **Trade-marks and trade-names and unfair competition ⬿95(1)—Temporary injunction against use of photoplay title denied.**

    Where plaintiff and defendant produced photoplays based on entirely different stories, but having the same title, and defendant has made 74 films, all of which must be changed if it changes the title, and entered into 240 contracts with exhibitors, and has advertised very widely, and a change of title would constitute a genuine hazard to its success, and some of the films were prepared, and some of the contracts let and advertisements displayed, before it knew of plaintiff's claims, a preliminary injunction *held* to be denied.

7. **Injunction ⬿137(2)—Defendant's loss balanced against plaintiff's gain in granting or denying temporary injunction.**

    On application for a temporary injunction, defendant's loss must be balanced against plaintiff's gain, and a sufficient disproportion will put plaintiff to his action.

---

⬿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**8. Trade-marks and trade-names and unfair competition ⟲═98—Expense of changing name of photoplay is proper element of damage from unfair competition.**

If plaintiff in good faith finds it necessary to change the title of its photoplay, because of defendant's unfair competition in the use of the same title, the expense of such change will be a proper item of damage.

In Equity. Suit by the International Film Service Company, Incorporated, against the Associated Producers, Incorporated. On motion for preliminary injunction. Denied.

This is a motion for an injunction against the exhibition of a photoplay by defendant. In 1906 one Bruno Schelling wrote and published in the Cosmopolitan Magazine a story under the title "Broken Doll." This was copyrighted under the general copyright of the magazine for that month, but appeared in no other form. In 1910, and again in 1914, two photoplays appeared under the name "Broken Doll," but the scenario of neither was in any sense based upon the story of Bruno Schelling. In the Saturday Evening Post during the year 1921 appeared a story on which the defendant's scenario is based, not in any way similar to Schelling's story. This has become the foundation of a play which is about to be exhibited under the name "Broken Doll." The play is in four reels, and was completed before April, 1921. It was advertised widely in trade papers at the end of April and the early part of May, and of the 74 contracts with exhibitors which were made before the motion came on to be heard, several had been closed before May 13th.

During the spring of 1921 the plaintiff caused a scenario to be made from Schelling's story, upon which it made a photoplay of two reels under the title "Broken Doll." The defendant had no notice of the plaintiff's play, nor any notice of the original story of Bruno Schelling, until May 13, 1921, at which time the plaintiff, having been advised of the proposed production of the defendant's play, asserted its rights. On May 16th it gave two single exhibitions at two theaters in the city of New York. It has not, however, exhibited again, and it is fair to suppose that these were for the purpose of obtaining the priority of right. The bill is based, not upon the plaintiff's copyright, but upon the unfair competition in the defendant's use of the title "Broken Doll," which had been earlier acquired by the plaintiff. The defendant was proposing to publish its play for the first time on June 12th.

Nathan Burkan, of New York City, for plaintiff.
Edward I. Devlin, Jr., of New York City, for defendant.

LEARNED HAND, District Judge (after stating the facts as above). This case does not turn upon any copyright in the title. So much the plaintiff appears to concede. Harper v. Ranous (C. C.) 67 Fed. 904; Glaser v. St. Elmo Co. (C. C.) 175. Fed. 276; Corbett v. Purdy (C. C.) 80 Fed. 901; Osgood v. Allen, Fed. Cas. No. 10,603; Atlas, etc., Co. v. Street, 204 Fed. 398, 403 (semble), 122 C. C. A. 568, 47 L. R. A. (N. S.) 1002. The rule appears to me to have been implicitly recognized in Nat., etc., Co. v. Foundation Film Co. (C. C. A.) 266 Fed. 208, 210. At least I shall dispose of the case on that assumption, in view of the plaintiff's reliance upon unfair competition.

In Osgood v. Allen, supra, unfair competition was said to depend upon whether the similarity of titles would lead purchasers of copies to suppose that they were to read a book written by the plaintiff. The rule has been frequently applied since that time, and was extended to photoplays in Nat., etc., Co. v. Foundation F. Co., supra. A dictum

in Atlas, etc., Co. v. Street, supra, seems to hold that the title to a story will not be protected against use in a photoplay, but it is not necessary to go so far here. On the contrary, the author of a story may contemplate turning it into a photoplay, and the use of its title by another in a different play may prejudice his rights when he does. Under Aunt Jemima Mills Co. v. Rigney & Co., 247 Fed. 407, 159 C. C. A. 461, he would certainly be protected. The English cases there cited have carried the protection of a name or mark into wholly dissimilar fields, quite as unlike as are a story and a play. It is not, therefore, in compliance with that dictum that I think the plaintiff should not here succeed.

[1, 2] A title is, if not strictly descriptive, at least suggestive, and not an arbitrary sign. Hence in Nat., etc., Co. v. Foundation F. Co., supra, the question is said to be of secondary meaning, following the long line of decisions in the Webster Dictionary cases. The plaintiff succeeds as soon as he shows an audience educated to understand that the title means his play. Once he shows a prior publication under that title, this becomes easier than in most cases of secondary meaning, because the title is the proper name of a specific thing, not the differential of a species, as in the case of fungibles. Ordinarily, I should, indeed, think that a single publication in a magazine so broadly circulated as the Cosmopolitan would be prima facie enough. The story presumptively has many readers, of whom a substantial number remember the title. That title, billed or advertised as the title of a photoplay, leads them to expect a play based on the story.

[3] Still, as is always the case in such suits, the question is one of fact. Here the story came out only once, and that 15 years ago. It was never reprinted, had nothing but the fugitive publicity of a magazine, which is not permanently preserved, except in the few files of collectors. If it remains at all in people's memory, it must be only in the recollection of such especially retentive minds as were impressed, unduly I should think, with its conventionally sentimental theme. The plaintiff must prove a case, and presumptions only help him as they give ground for an honest inference, in the absence of adequate information; that is all they ever are. The presumption here is an extremely doubtful inference.

[4] Furthermore, not only is the story 15 years old, but the title has been twice used since that time on other photoplays; i. e., in 1910 and 1914. It is impossible to say what effect this has had in fact; but, as we must in any case proceed upon presumptions, it must be presumed that many people saw these two plays, and they at any rate could no longer have supposed that "Broken Doll" meant only Schelling's story. In the face of all this, it seems to me an ingenuous assumption to suppose that there are any substantial number of people who to-day attribute any secondary meaning to the title at all. The plaintiff's right, so far as based upon the original story, is therefore, in my judgment, too doubtful to sustain a preliminary injunction.

[5] As to the exhibitions of May 16, 1921, it is perhaps enough to say that as exhibitions they were not the first; the title having already

been used twice before. Since priority is always the test, the only priority on which the plaintiff can rely is therefore that of the story. It is indeed quite true that there may be people now who, having seen the performances on May 16, 1921, and being careless of more than the title, will spread the title about among others. These in turn may go to the defendant's play, supposing it is that recommended to them. But obviously cases cannot be decided on such speculation, and it is indeed for that reason that in this subject priority counts for so much. Based upon the exhibitions of May 16, 1921, the plaintiff's case seems to me, also, too uncertain.

[6] Yet if I am wrong in both these respects, and if the plaintiff can base a prima facie case either on the story or on the two exhibitions last month, it still seems to me clear that no preliminary injunction should issue now. Let me assume that it might be otherwise if the defendant's venture were just beginning, and if a change of title could be made without loss. The facts in the case at bar are quite different. The defendant has made 74 films, all of which it must change in many places; it has entered into 240 contracts with exhibitors; it has advertised very widely, and the success of its play is at genuine hazard, if it must now recall it on the very eve of the exhibitions. It is true that, since May 13, 1921, it knew of the plaintiff's claims; but the films were already all prepared, some of the contracts let, and the advertisements had been several times displayed. Moreover, at that date, the plaintiff had done nothing to acquire any rights, except under the original story, which the defendant might honestly have disregarded. How soon after the performance of May 16th it learned of them does not clearly appear. At best, it had no reason till then, I think, to change its plans, and that time is not fixed.

[7] Against this embarrassment of being obliged so to change its plans, nothing can be balanced but the possibility that some who read the story and who did not see the earlier plays, or some who saw the later plays and not the earlier, may be misled, or may mislead others, into mistakenly attending the defendant's plays. The right to a preliminary injunction is not so absolute as to require me to grant one under such conditions. In cases of the piracy of a mark (Waldes v. International Mfrs.' Agency [D. C.] 237 Fed. 502), or of a name (Kathreiner's Malzkaffee Fab. v. Pastor Kneipp's Med. Co., 82 Fed. 321, 27 C. C. A. 351), little prior use is necessary; the court imposes the chances of loss upon those who deliberately steal the name. But such is not this case; the defendant is quite innocent of plagiarism, and finds itself unwittingly in peril of losing much of its investment to protect the plaintiff against an extremely doubtful and probably insubstantial loss. Nothing in the books requires a court to give such an injunction, especially a preliminary injunction. On the other hand, it has been repeatedly said that the defendant's loss must be balanced against the plaintiff's gain, and that a sufficient disproportion will put the plaintiff to his action. This has indeed even been held where the plaintiff's loss is clearer than it is at bar. Sampson, etc., Co. v. Seavor-Radford Co. (C. C.) 129 Fed. 761; Kemmerer v. Midland, etc., Co.,

229 Fed. 872, 876, 144 C. C. A. 154; Contra Costa Water Co. v. City of Oakland, 165 Fed. 518, 533; Amelia Milling Co. v. Tenn. C. I. & R. Co. (C. C.) 123 Fed. 811, 813. As Judge Taft said in New England, etc., Co. v. Oakwood, etc., Co. (C. C.) 71 Fed. 52, "preliminary injunctions are granted on a balance of convenience."

[8] It therefore appears to me that, granting the doubtful conclusion that the plaintiff will be damaged to some extent, justice will not be served by unconditionally stopping the performance of the defendant's plays at this eleventh hour. However, the plaintiff may take an order compelling the defendant to keep an account of its profits and to its books the plaintiff shall have access. Furthermore, the defendant will give a bond in the sum of $25,000, to secure it for any profits or damages which the plaintiff may prove on final hearing. If the defendant fail to file the bond on or before June 11, 1921, an absolute injunction may issue. I am, of course, aware that such a bond is of small value in cases of this sort. It is practically impossible to prove damages, and the defendant's profits are scarcely available. Yet at least this is true: If the plaintiff in good faith feels it necessary to change its own title, the expense of that change would be a proper item of damage. The plaintiff will not be secured against any loss arising from the difference in success of its play under the new title and the old; that cannot probably be ascertained in any way, so far as I can see. That difference, for the reasons I have already given, is, however, so tenuous and uncertain that at least at this stage in the case it is an undependable basis for relief.

Motion denied.