## WARNER BROS. PICTURES, Inc., v. MAJESTIC PICTURES CORPORATION et al.

### No. 169.

Circuit Court of Appeals, Second Circuit.

April 16, 1934.

Thomas & Friedman, of New York City (Morris Ebenstein, of New York City, of counsel), for complainant-appellant.

Krellberg & Fitzsimons, of New York City (Alfred S. Krellberg and Arthur J. Homans, both of New York City, of counsel), for defendants-appellees.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

This is an appeal from an order denying a motion to enjoin the defendants pendente lite from producing a talking motion picture under the title "Gold Diggers of Paris." "The Gold Diggers" was the title of a play by Avery Hopwood which was produced by David Belasco at the Lyceum Theater in New York, and continued for 90 successive weeks after opening on September 30, 1919. Subsequently the play was taken on tour through the United States, and 528 performances were given between September 13, 1921, and April 21, 1923. There were gross receipts from the play of more than $1,900,000, and much money was expended in advertising. Even since April, 1923, there have been many performances by stock companies, some as late as 1932, under the title "The Gold Diggers."

In 1923 the complainant acquired the exclusive silent motion picture rights in "The Gold Diggers," and during that year produced a silent motion picture based on this play and distributed the picture under the same title. The gross receipts derived from licensing theater owners to exhibit it amounted to $470,000.

In 1929 complainant purchased the talking motion picture rights in "The Gold Diggers," and produced a talking motion picture based on the play at an expense of $725,000, which it opened at the Winter Garden in New York on August 30, 1929. This picture was exhibited in over 6,000 theaters in the United States and Canada under the title "Gold Diggers of Broadway." The total re-

ceipts from licensing it in the United States and Canada were $2,540,298.47. It was seen by millions of people, and complainant expended upwards of $74,000 in advertising it. Complainant received $1,395,344.54 upon licenses outside of the United States and Canada. Such was the success of this picture that complainant determined to produce a new talking motion picture version of the play under the title "Gold Diggers of 1933," for the production of which $199,983 had been expended at the time the motion for the preliminary injunction was made. In 1933 defendants produced a picture under the title "Gold Diggers of Paris," having certain characters similar to those in Hopwood's play.

The original play is said to have dealt with the lives and actions of two young women who had come to New York and there joined the chorus of a musical comedy. One of the young women who took the leading role was represented as having good moral instincts and as being somewhat dissatisfied with or uncomfortable in the life that she was leading. Her friend, who took the subordinate part and was responsible for the comedy element, was not so handicapped. She was decidedly the louder and more vulgar of the two, and was a low comedy character.

The complaint and the affidavits submitted in support of this motion for an injunction allege that the use of the title "Gold Diggers of Paris" was with intent to capitalize the good will and reputation of complainant and to deceive the public into associating defendants' motion picture with Avery Hopwood's play and complainant's motion pictures.

While the answer denied, upon information and belief, the allegations in the bill, the defendants meet the facts set up in the affidavits in no satisfactory way and say little more than that it is unethical to distribute more than one motion picture based on the same play within five years, and therefore unlikely that the complainant's picture "Gold Diggers of 1933" is based on the Hopwood play, for Warner Bros. Pictures, Inc., had distributed "Gold Diggers of Broadway" as recently as 1929–1932.

Enough appears in the affidavits to show that the complainant would be an infringer of the copyright of the original play of Avery Hopwood if it had not purchased the right to make silent and talking picture versions thereof. Perhaps, if the play and the scenarios for the pictures were before us, we might not reach this conclusion, but when it appears that Warner Bros. Pictures, Inc., went to the expense of buying the silent and talking rights, and the affidavits state that all the pictures were based on the play, and no showing has been made to the contrary, we must assume that the moving pictures were thus founded. Complainant's asserted right to an injunction is not, however, based on infringement of a copyright of the play, but on an unfair use of the words "Gold Diggers." A copyright of a play does not carry with it the exclusive right to the use of the title. National Picture Theatres v. Foundation Film Corp. (C. C. A.) 266 F. 208; Atlas Mfg. Co. v. Street & Smith (C. C. A.) 204 F. 398, 47 L. R. A. (N. S.) 1002; International F. Service Co. v. Associated Producers (D. C.) 273 F. 585; Glaser v. St. Elmo Co. (C. C.) 175 F. 276; Corbett v. Purdy (C. C.) 80 F. 901; Harper v. Ranous (C. C.) 67 F. 904; Osgood v. Allen, Fed. Cas. No. 10,603. But complainant, by its purchase of the right to produce silent and talking motion pictures of Hopwood's play and by its investment of capital and labor in the pictures founded upon it, has built up a valuable good will in a business of pictures of this particular type. The cinematograph productions which it has advertised and distributed under the title "Gold Diggers" and "Gold Diggers of Broadway" have become associated in the public mind all over the United States with the Hopwood play and the productions of Warner Bros. Pictures, Inc., and the title "Gold Diggers" has thus acquired a distinctive meaning in the motion picture field as descriptive of film versions of the Hopwood play produced by complainant. The words have not before been used, either alone or in combination, to designate any other full-length motion pictures. It is true that they are words of general description and ordinarily would not be subject to preemption by any one, but they may not be used by a competitor to deceive a public which has long attributed them to complainant's moving pictures. National Picture Theatres, Inc., v. Foundation Film Corp. (C. C. A.) 266 F. 208; Underhill v. Schenck, 238 N. Y. 7, 20, 143 N. E. 773, 33 A. L. R. 303; Paramore v. Mack Sennett, Inc. (D. C.) 9 F.(2d) 66.

The trial judge denied an injunction on the ground that the public would not be misled by the title of defendants' motion picture. But the public, by the exhibition of complainant's pictures throughout the United States, has been educated to regard "Gold

Diggers," when used in connection with a motion picture, as meaning one of complainant's pictures based on Hopwood's play. The wide publicity and success of complainant's pictures seem to us to lead to this inference inescapably unless it is rebutted by specific evidence, as it has not been. An intent to "gain the advantage" of complainant's "celebrity" (McLean v. Fleming, 96 U. S. at page 251, 24 L. Ed. 828) seems evident, and diversion of the latter's business and deception of the public are likely, if not inevitable, consequences of the acts complained of (National Picture Theatres v. Foundation Film Corp [C. C. A.] 266 F. 208, 211; International F. Service Co. v. Associated Producers [D. C.] 273 F. 585, 587; Samson, etc., Works v. Puritan, etc., Mills, 211 F. at page 608, L. R. A. 1915F, 1107; Miller, etc., Co. v. Behrend [C. C. A.] 242 F. at page 518). The defendants have produced a picture having some characters resembling those in Hopwood's play. But their picture apparently differs in many respects and is said to be based on another play, and it does not seem to be claimed by any of the parties that there is so great a similarity between defendants' picture and any of complainant's productions as to show an appropriation of the plot or literary content of the Hopwood play. Indeed, it may be assumed that defendants' picture is wholly different in origin and subject-matter. Nevertheless the use of the descriptive words "Gold Diggers" in the title of defendants' picture would be unfair and misleading, for they would represent to the public that the picture exhibited was produced by Warner Bros. Pictures, Inc., and based on Hopwood's play. The likelihood of confusion and proof of it are as strong as in National Picture Theatres v. Foundation Film Corp. (C. C. A.) 266 F. 208.

It is argued that the silent picture "Gold Diggers" and the talking picture "Gold Diggers of Broadway" have run their course and no longer need protection, and that defendants applied the name "Gold Diggers of Paris" to a new talking picture of their own before complainant put out "Gold Diggers of 1933." Even if this were so, it would seem to afford no excuse for defendants' acts. The words had become descriptive of any cinematograph productions of the complainant based upon the Hopwood play, and there is no more reason for depriving the complainant of their use in a new production based on the Hopwood play than there would be to limit a common law trade-mark of a clothing manufacturer to the styles of clothing he had previously sold and to deny protection where it was used in connection with new designs. The rule in trade-marks is analogous. As Justice Holmes said in Beech Nut Co. v. Lorillard Co., 273 U. S. 629, 632, 47 S. Ct. 481, 482, 71 L. Ed. 810:

"A trade-mark is not only a symbol of an existing good will although it commonly is thought of only as that. Primarily it is a distinguishable token devised or picked out with the intent to appropriate it to a particular class of goods and with the hope that it will come to symbolize good will. Apart from nice and exceptional cases and within the limits of our jurisdiction a trade-mark and a business may start together, and in a qualified sense the mark is property, protected and alienable, although as with other property its outline is shown only by the law of torts, of which the right is a prophetic summary. Therefore the fact that the good will once associated with it has vanished does not end at once the preferential right of the proprietor to try it again upon goods of the same class with improvements that renew the proprietor's hopes."

Furthermore, even though "Gold Diggers of Broadway" and "Gold Diggers of 1933" should be found to have so little resemblance to the Hopwood play as not to be within the copyright, still it may be said that the title "Gold Diggers" through wide publicity and long use has come to mean a moving picture of the general type we have described produced by Warner Bros. Pictures, Inc., and that it is unfair for the defendants to use these words in connection with another motion picture play of the same general type. Irrespective of whether there is continuity of plot or composition in complainant's moving pictures and Hopwood's play, we think the defendants are precluded from using the title "Gold Diggers" for any motion picture play likely to compete with complainant's productions. The words signify origin and a certain standard of competence and achievement.

An injunction pendente lite should issue restraining the defendants from using the words "Gold Diggers" in connection with the motion picture "Gold Diggers of Paris" unless they place upon every piece of advertising used in connection with the picture and upon the motion picture film also, the words, in type as large as "Gold Diggers": "A production of Majestic Pictures Corporation, not based on Avery Hopwood's play or on the motion pictures of Warner Bros. Pictures, Inc.," or some equivalent words of

differentiation which may be settled by the District Court after hearing the respective parties. In view of the fact that the words "Gold Diggers" are in themselves terms of general description, it is but to limit their use only so far as may be necessary to prevent unfair competition, and we think that may be done along the general lines which we have indicated. Ziegfeld Follies, Inc., v. Hill, 177 App. Div. 881, 163 N. Y. S. 1135.

Order reversed.