MEMORANDUM OPINION
 

 ELLIS, District Judge.
 

 In this trademark infringement action brought pursuant to section 43(a) of the Lanham Act, 15 U.S.C. § 1125, plaintiffs, the heirs of an author and owners of that author’s work, claim that defendant’s motion picture bears a title which is confusingly similar to the title of a short story published over half a century ago by the author. The summary judgment motion at bar presents,
 
 inter alia,
 
 the question whether plaintiffs may claim trademark protection in the title of a single expressive work, when the title is also the name of a science fiction genre.
 

 I
 

 Plaintiffs are the heirs of William F. Jenkins, a science fiction author who published works of fiction under the pseudonym, “Murray Leinster.” Among Jenkins’ work is the novellette
 
 [1]
 
 “First Contact,” the title of which is the subject of this litigation. Defendant Paramount Pictures Corporation produces, advertises and distributes television programs, movies, and related products.
 

 In 1945, Jenkins, using his pseudonym, published “First Contact” in the magazine
 
 Astounding Science-Fiction.
 
 “First Contact,” put simply, is a tale of mankind’s first encounter with extraterrestrial life. Although many stories, books, and movies examine alien encounters with earthlings, Jenkins’ short story is widely regarded as the prime example of this plot.
 
 [2]
 
 In that regard, Jenkins’ story has been reprinted in numerous anthologies since its initial publication in 1945, and in 1996, twenty-one years after Jenkins’ death, the story was honored with a 1946 Retro-Hugo Award.
 
 [3]
 
 In addition, perhaps as a result of Jenkins’ story, a vast line of literature, movies, and nonfiction reports of alien encounters are described as “first contact” stories.
 

 Defendant owns all of the so-called Star Trek properties. The Star Trek franchise includes nine motion pictures, four television series, and a large and extremely lucrative licensing and merchandising program. Defendant owns at least fifty registered trademarks related to Star Trek, which marks are licensed for use on a wide variety of merchandise, including books,
 
 *708
 
 toys, bookmarks, games, greeting cards, watches, clocks, software, and other goods. In total, defendant and its licensees have sold over $1 billion of Star Trek-related merchandise. Further evidence of Star Trek’s ubiquity is found in a vast and mysterious Star Trek subculture, comprised of people who call themselves Trek-kies or Trekkers. In short, through defendant’s aggressive merchandising and the enduring popularity of the Star Trek television shows, movies, and books, STAR TREK has become one of the most famous trademarks in the world.
 

 In 1996, defendant released the eighth Star Trek motion picture, “Star Trek: First Contact.” This movie tells the story of Earth’s first contact with alien life in the twenty-first century, an encounter that is Earth’s first step towards entry into the Federation of Planets, and the beginning of an era of peace and prosperity for our troubled planet. Apparently, the Borg, “a half-organic, half machine collective with a sole purpose: to conquer and assimilate all races,”
 
 [4]
 
 has traveled backward through time from the twenty-fourth century, to prevent Earth’s entry into the Federation. The crew of the U.S.S. Enterprise, captained by the fearless Jean-Luc Picard, follows the Borg back through time in an effort (successful, of course) to halt its evil scheme.
 

 Defendant applied for, and received, various trademark registrations for STAR TREK: FIRST CONTACT,
 
 [5]
 
 and consistent with defendant’s practice, used that mark to sell a wide variety of goods. Plaintiffs contend that their ownership of Jenkins’ story gives them trademark protection for the phrase FIRST CONTACT and that defendant’s use of the phrase violates their trademark rights. Plaintiffs seek in-junctive relief, damages, and cancellation of defendant’s mark, STAR TREK: FIRST CONTACT. Defendant now moves for summary judgment.
 

 II
 

 On a motion for summary judgment, the moving party must demonstrate that “there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.” Rule 56(c), Fed.R.Civ.P. The facts themselves, and the inferences to be drawn from those facts, must be viewed in the light most favorable to the nonmoving party.
 
 See Ross v. Communications Satellite Corp.,
 
 759 F.2d 355, 364 (4th Cir.1985). Summary judgment is appropriate when a party “fails to make a showing sufficient to establish the existence of an element essential to that party’s case, and on which that party will bear the burden of proof at trial.”
 
 Celotex Corp. v. Catrett,
 
 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The opposing party must do more than “simply show that there is some metaphysical doubt as to the material facts.”
 
 Matsushita Electric Industrial Co., Ltd., v. Zenith Radio Corp.,
 
 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Moreover, “the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.”
 
 Anderson v. Liberty Lobby Inc.,
 
 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In addition, in a case in which the nonmoving party bears the burden of proof at trial, as in this case, “Rule 56(e) requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the ‘depositions, answers to interrogatories, and admissions on file,’ designate ‘specific facts showing that there is a genuine issue for trial.’ ”
 
 Celotex,
 
 477 U.S. at 324,106 S.Ct. 2548.
 

 III
 

 To prevail on a claim brought pursuant to § 43(a) of the Lanham Act, 15 U.S.C. § 1125, plaintiffs must show (i) that FIRST CONTACT is entitled to trade
 
 *709
 
 mark protection and (ii) that defendant’s use of the phrase is likely to cause confusion among consumers.
 
 See Lone Star Steakhouse & Saloon v. Alpha of Va.,
 
 43 F.3d 922, 930 (4th Cir.1995). Because the putative mark, FIRST CONTACT, is not registered with the trademark office,
 
 [6]
 
 plaintiffs bear the burden of proof on both inquiries.
 
 [7]
 
 And in this case, analysis begins and ends with the question whether plaintiffs may claim trademark protection for the phrase FIRST CONTACT.
 

 The value of a trademark to the trademark holder is tied to the good will that the mark represents to consumers.
 
 [8]
 
 Consequently, the degree of protection a trademark receives “is directly related to the mark’s distinctiveness.”
 
 Sara Lee Corp. v. Kayser-Roth Corp.,
 
 81 F.3d 455, 464 (4th Cir.1996). To determine the degree of protection a trademark deserves, courts typically categorize marks as “fanciful,” “arbitrary,” “suggestive,” “descriptive,” or “generic,” in descending order of strength.
 
 [9]
 

 See, e.g., Sara Lee Corp.,
 
 81 F.3d at 464. Fanciful, arbitrary, and suggestive marks are inherently distinctive and receive the highest degree of trademark protection; descriptive marks are not inherently distinctive, and receive trademark protection only upon a showing that the mark possesses secondary meaning;
 
 [10]
 
 and generic marks receive no pro-
 
 *710
 
 teetion, as they are simply the “common name of a product or service itself.”
 
 [11]
 

 See Sam Lee Corp.,
 
 81 F.3d at 464.
 

 Courts typically have not applied this analytical framework to titles of single expressive works; instead, they have assumed that the title of a single 'work is entitled to trademark protection only upon a showing of secondary meaning, without classifying that title as a descriptive mark.
 
 [12]
 
 These decisions have led the Second Circuit and trademark law’s leading commentator to observe that titles of expressive works are treated differently from other trademarks, in that titles, even if suggestive, arbitrary, or fanciful, nonetheless require secondary meaning to receive trademark protection, while other suggestive, arbitrary, and fanciful marks do not.
 
 [13]
 
 On closer scrutiny, this perceived difference is illusory, because the title of a single work is, by its very nature, at best, descriptive of that work. This follows from the observation that each expressive work is inherently unique, distinct, and original, “the contents of which are new ideas in different forms.”
 
 In re Cooper,
 
 45 C.C.P.A. 923, 254 F.2d 611, 618 (Oust.
 
 &
 
 Pat.App.1958). And when an author writes a novel or a song, and assigns a title to that novel or song, the title becomes the primary means of referring to that work.
 
 [14]
 
 Yet the novel, song, poem, or play is but one characteristic of the product that is eventually sold: A novel may be illustrated, bound in hardback, or embossed; a song may be sold by itself or included in an album. The product that is
 
 *711
 
 sold is not the song or the novel; it is the compact disc or the book. And the title describes but one (albeit significant) characteristic of that compact disc or book.
 
 [15]
 
 Thus, the title of a single expressive work is descriptive of that work, no matter how that work is packaged or from what source it is derived.
 
 [16]
 
 More precisely, titles, by their nature, are neither suggestive nor arbitrary; they are instead inherently descriptive or, in some instances, generic. Accordingly, the title of a single expressive work may receive trademark protection only upon a showing that the title is not generic, and that it has acquired secondary meaning.
 

 Analysis thus begins with the question whether FIRST CONTACT is generic, when that mark is used as the title of an expressive work. A term is generic if it “ ‘denominate[s] a type, kind, genus or subcategory of goods,’ ” or if it “ ‘identifies the general nature of an article.’ ”
 
 Sara Lee Corp.,
 
 81 F.3d at 464 n. 10 (citations omitted). Put differently, “[a] generic term is one that refers to the genus of which the particular product is a species.”
 
 Park ‘n Fly, Inc. v. Dollar Park and Fly, Inc.,
 
 469 U.S. 189, 194, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985). Or, as the leading commentator on trademark law put it, “descriptive terms describe a thing, while generic terms name the thing.” 2 McCarthy on Trademarks § 12:20.
 

 It follows from this principle that the title of a single expressive work is generic if that title is the name of a subcategory of which the work in question is a member. And one means of organizing single expressive works into subcategories is to sort each work according to its respective genre.
 
 [17]
 
 Accordingly, FIRST CONTACT is generic, even if,
 
 ab initio,
 
 it was descriptive of Jenkins’ story, because that phrase has come to describe an entire genre of science fiction, namely literature about humankind’s first encounter with extraterrestrial life. It is undisputed that commentators routinely refer to “first contact” stories, a genre that includes movies and books about human encounters with space aliens.
 
 [18]
 
 Indeed,
 
 The Encyclopedia
 
 
 *712
 

 of Science Fiction
 
 refers to “first contact stories” as “the most common communications [with alien life] scenario in [science fiction]” and names Jenkins’ story, as “perhaps the best known of them.”
 
 [19]
 
 Furthermore, at least two books about alien, encounters (fictional or otherwise) have been published that include FIRST CONTACT in their title, but do not include Jenkins’ story or involve defendant’s motion picture.
 
 [20]
 
 It is thus clear from the record, that FIRST CONTACT has become the generic term for an entire class of stories, books, and films, of which Jenkins’ story is now simply one example, although it was the seminal example.
 
 [21]
 
 Accordingly, FIRST CONTACT, because it is generic, is not entitled to trademark protection.
 
 [22]
 

 Even assuming
 
 arguendo
 
 that FIRST CONTACT is not generic, but is instead a descriptive mark that refers to Jenkins’ story, plaintiffs have not shown that the mark has secondary meaning. A mark has secondary meaning when, “in the mind of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself.”
 
 Sara Lee Corp.,
 
 81 F.3d at 464 (citation and internal quotation marks omitted). It follows from this general principle that the title of a single expressive work has secondary meaning when “the title is sufficiently well known that consumers associate it with a particular author’s work.”
 
 Rogers v. Grimaldi, 875
 
 F.2d at 998. The “particular author” may be unknown, as long as consumers believe the mark refers to a “single source, even if that source is anonymous.”
 
 Mal-jack Productions, Inc. v. GoodTimes
 
 
 *713
 

 Home Video Corp.,
 
 81 F.3d 881, 887 (9th Cir.1996).
 

 The question of secondary meaning is a fact-based inquiry, in which the following factors are relevant: (i) advertising expenditures, (ii) consumer studies, (iii) sales success, (iv) unsolicited media coverage of the work, (v) attempts to plagiarize the mark, (vi) the length and exclusivity of the mark’s use, and (vii) evidence of actual confusion.
 
 [23]
 
 In this case, none of the relevant factors operate in plaintiffs’ favor. First, there is no record evidence that plaintiffs have spent any substantial time, energy, or money advertising or promoting the mark, or that they ever attempted to trade on the mark in any way other than by licensing the story for inclusion in anthologies and release as a book on tape. Indeed, that a story has been distributed in many different forms suggests that it emanates from several publishing sources, rather than a single source. Second, plaintiffs have not shown that consumers believe FIRST CONTACT refers primarily to Jenkins, his story, or a single, otherwise anonymous source.
 
 [24]
 
 Instead, the record reflects that FIRST CONTACT is commonly used to describe an alien encounter, whether it be fiction or otherwise, and not to refer to Jenkins or his story.
 
 [25]
 
 Third, the record reflects that the mark
 
 *714
 
 has achieved only slight sales success, in that Jenkins’ story has generated a modest $7,000 in revenues since his death in 1975, and there is no evidence that the story or the mark has been otherwise used. Fourth, unsolicited media coverage is relatively rare, and, in any event, overwhelmed by references to the term FIRST CONTACT without reference to Jenkins/Leister or his story. Fifth, there is no evidence that people plagiarized the mark, or otherwise attempted to free ride on plaintiffs’ good will. Sixth, while plaintiffs have shown that the alleged mark has been used as the title of Jenkins’ short story since 1945, they have not shown exclusive use of the phrase as a either a mark or title. And seventh, the evidence of actual confusion is extremely limited. Plaintiffs have identified four people who plaintiffs claim were “confused” by defendant’s mark. Yet, of the allegedly confused people, one is a plaintiff in this case, one is Jenkins’ former literary agent, one is an unidentified person who was present at the Hugo Awards Ceremony where Jenkins was honored, and one is a science fiction fan who, in a letter to the Los Angeles Times, described Jenkins’ work as “highly praised and much anthologized.” In short, these anecdotal references are both unrepresentative and biased, and therefore do not create an issue of fact sufficient to forestall summary judgment. Thus, even assuming FIRST CONTACT were descriptive and not generic, plaintiffs have not shown that the term has secondary meaning.
 

 In sum, plaintiffs’ trademark infringement, trademark dilution, and misappropriation
 
 [26]
 
 claims must fail, as FIRST CONTACT is not entitled to trademark protection. Similarly, plaintiffs’ claim for the cancellation of defendant’s mark relies on plaintiffs’ prior use of FIRST CONTACT, a use which, for the reasons noted, lacks trademark significance. Accordingly, plaintiffs’ complaint must be dismissed, and the merits of defendant’s affirmative defenses need not be reached.
 
 [27]
 

 An appropriate order will issue.
 

 The Clerk is directed to forward copies of this Memorandum Opinion to all counsel of record.
 

 [1]
 

 . Plaintiffs describe the work as a "novel-lette.” More accurately, it appears to be a short story, as it barely exceeds thirty pages in length.
 

 [2]
 

 . And, it appears that Jenkins, owing to this and his other stories, is held in high regard by science fiction fans, some of whom refer to him as the "dean of science fiction.”
 

 [3]
 

 . The Science Fiction Achievement Awards, known popularly as the Hugo Awards, have been awarded since 1953, and recognize the best recent achievement s in science fiction. In 1996, the World Science Fiction Convention (known as “Worldcon”), at which the Hugos are awarded, was held in Los Angeles. Significantly, 1996 marked the fiftieth anniversary of the first. Los Angeles Worldcon, Pacificon I. To mark the occasion, the organizers of the event awarded "Retrospective Hugos” or "Relro-Hugos,” for those works of science fiction which would have received a Hugo Award in 1946, had the awards then existed.
 

 [4]
 

 .
 
 Star Trek: First Contact,
 
 Videotape Jacket (Paramount 1997).
 

 [5]
 

 . Defendant does not claim trademark rights in FIRST CONTACT standing alone.
 

 [6]
 

 . The Patent and Trademark Office does not register the title of a single literary work as a trademark.
 
 See
 
 2 McCarthy on Trademarks and Unfair Competition § 10:4 (4th. ed.1999) (hereinafter "McCarthy on Trademarks”). Nonetheless, courts have routinely held that titles are eligible for trademark protection in appropriate circumstances.
 
 See id.; In re Cooper,
 
 45 C.C.P.A. 923, 254 F.2d 611, 616-17 (Cust. Pat.App.1958) (upholding trademark office’s refusal to register a book title as a trademark, but noting that "the rights in book titles are afforded appropriate protection under the law of unfair competition”);
 
 see also Sugar Busters LLC v. Brennan,
 
 177 F.3d 258, 269 (5th Cir.1999);
 
 Maljack Productions, Inc. v. GoodTimes Home Video Corp.,
 
 81 F.3d 881, 887 (9th Cir.1996);
 
 Twin Peaks Productions, Inc. v. Publications International, Ltd., 996
 
 F.2d 1366, 1379 n. 4 (2d Cir.1993);
 
 Rogers v. Grimaldi,
 
 875 F.2d 994, 998 (2d Cir.1989).
 

 [7]
 

 .
 
 See Platinum Home Mortgage Corp. v. Platinum Fin. Group, Inc.,
 
 149 F.3d 722, 726 (7th Cir.1998);
 
 Blinded Veterans Ass’n v. Blinded Am. Veterans Found.,
 
 872 F.2d 1035, 1041 (D.C.Cir.1989);
 
 Washington Speakers Bureau, Inc. v. Leading Authorities, Inc.,
 
 33 F.Supp.2d 488, 494 (E.D.Va.1999).
 

 [8]
 

 .
 
 See
 
 1 McCarthy on Trademarks and Unfair Competition § 2:15 (4th ed. 1999) (" A trademark is a very peculiar kind of property. For it has no existence apart from the good will of the product or service it symbolizes. Good will of a business and its symbol, a trademark, are inseparable.”).
 

 [9]
 

 . Fanciful marks are terms that enter the language as a trademark for a particular good or service, and include "Zazu's” and "Zima.”
 
 See Sara Lee Corp.,
 
 81 F.3d at 464. An arbitrary mark uses a word or words that predate thc good or service, but, like "Red Hat” lor a computer operating system, do not "suggest or describe any quality, ingredient, or characteristic of the goods they serve.”
 
 Id.
 
 A suggestive mark "connotéis], without describing, some quality, ingredient, or characteristic of the product.”
 
 Id.
 
 Suggestive marks "conjure images of the associated products” and "are meant to project a favorable or idealistic image with which a prospective user might identify.”
 
 Id.
 
 Yet, suggestive marks do not describe the product, and "a person without actual knowledge would have difficulty in ascertaining the nature of the products that the marks represent.”
 
 Id.
 
 Examples of suggestive marks include “At a Glance” for calendars, "Charred Keg” for whisky, and "Gung Ho” for an action figure.
 
 See
 
 2 McCarthy on Trademarks § 11:72. Suggestive, arbitrary, and fanciful marks are "inherently distinctive,” because they do not, by their terms, describe a particular product or product’s characteristic or function.
 
 See Sara Lee Corp.,
 
 81 F.3d at 464.
 

 Descriptive marks, on the other hand, "describe a function, use, characteristic, size, or intended purpose of the product."
 
 Id.
 
 Descriptive marks are subject to trademark protection only upon a showing that the mark in question possesses secondary meaning. See
 
 id.
 
 According to the Fourth Circuit, “Coca-Cola” is “the paradigm of a descriptive mark that has acquired secondary meaning.”
 
 Id.
 

 [10]
 

 . “Secondary meaning is the consuming public's understanding that the mark, when used in context, refers, not to what the descriptive word ordinarily describes, but to the particular business that the mark is meant to identify.”
 
 Perini Corp. v. Perini Constr., Inc.,
 
 915 F.2d 121, 125 (4th Cir.1990).
 

 [11]
 

 . A generic term is not subject to trademark protection, because "no matter ... what success [the trademark owner] has achieved in securing public identification, it cannot deprive competing manufacturers of the product of the right to call an article by its name."
 
 Abercrombie & Fitch Co. v. Hunting World, Inc.,
 
 537 F.2d 4, 9 (2d Cir.1976).
 

 [12]
 

 .
 
 See Sugar Busters LLC v. Brennan,
 
 177 F.3d 258, 269 (5th Cir.1999) (holding that the title of a single literary work may be subject to trademark protection on a showing of secondary meaning);
 
 Maljack Productions, Inc. v. GoodTimes Home Video Corp.,
 
 81 F.3d 881, 887 (9th Cir.1996) ("When a movie is not in the public domain, a showing of secondary meaning only requires proof that the public associates the movie title with a single source....”);
 
 Twin Peaks Productions, Inc. v. Publications International, Ltd.,
 
 996 F.2d 1366, 1379 n. 4 (2d Cir.1993) (literary titles subject to trademark protection only on a showing of secondary meaning);
 
 Rogers v. Grimaldi,
 
 875 F.2d 994, 998 (2d Cir.1989) ("[I]t is well established that where the title of a movie or a book has acquired secondary meaning ... the holder of the rights to that title may prevent the use of the same or confusingly similar titles by other authors”);
 
 Warner Bros. Pictures, v. Majestic Pictures Corp.,
 
 70 F.2d 310, 311 (2d Cir.1934) (a title "may not be used by a competitor to deceive a public which has long attributed [it] to complainant's moving pictures”);
 
 Morgan Creek Productions Inc. v. Capital Cities/ABC Inc., 22
 
 U.S.P.Q.2d 1881, 1882-83 (C.D. Cal. 1991) (movie title must have acquired secondary meaning to be subject to trademark protection);
 
 Orion Pictures Co., Inc. v. Dell Publishing Co., Inc.,
 
 471 F.Supp. 392, 395 (S.D.N.Y. 1979) ("For a ... title to be protectable under the doctrine of unfair competition, it is necessary that the title have obtained some secondary meaning.”) (citation omitted);
 
 Brandon v. Regents of the University of California,
 
 441 F.Supp. 1086, 1091 (D.Mass.1977) (title may be protected by Lanham Act if it has secondary meaning);
 
 International Film Serv. Co. v. Associated Producers, Inc.,
 
 273 F. 585, 587 (S.D.N.Y.1921) ("The plaintiff succeeds as soon as he shows an audience educated to understand that the title means his play.”).
 

 [13]
 

 .
 
 See Twin Peaks Productions, Inc. v. Publications International, Ltd.,
 
 996 F.2d 1366, 1379 n. 4 (2d Cir.1993) ("Ordinarily a suggestive mark is entitled to protection without any showing of secondary meaning because it is inherently distinctive. However, we have applied a more stringent rule to literary titles, in requiring the trademark proprietor to demonstrate secondary meaning
 
 notwithstanding
 
 the suggestive nature of the title.”) (citations omitted, emphasis added); 2 McCarthy on Trademarks § 10:2 ("[T]he courts have given trademark protection to literary titles of one-shot, single works only upon a showing of secondary meaning, even though the title is not descriptive of the contents of the work.”).
 

 [14]
 

 .
 
 See In re Cooper,
 
 254 F.2d at 615-16;
 
 Gotham Music Serv. Inc. v. Denton & Haskins Music Pub. Co.,
 
 259 N.Y. 86, 89, 181 N.E. 57 (1932) (holding that the name of a song "describes the song and, generally speaking, any one may use it to describe the same song”).
 

 [15]
 

 . Indeed, when a work is within the public domain, and publishers compete to distribute that work, they describe their product by reference to the work’s title — and in that event, the title no longer communicates source. Thus, a person seeking to purchase Voltaire’s
 
 Candide
 
 has myriad choices, including,
 
 inter alia,
 
 the Bedford Series in History and Culture edition, the Dover Thrift edition, the Oxford World’s Classics edition, the Modern Library edition, and the Crofts Classics edition. Each publisher who sells a version of
 
 Candide
 
 refers to it by its title or some variation thereof, such as
 
 Candide: A Dual-Language Book.
 
 The same reasoning applies to works that are not within the public domain. For example, one refers to
 
 The Bonfire of the Vanities,
 
 rather than to "the novel, set in the 1980s, that tells the story of a bond trader whose good fortune evaporates as he finds himself mired in New York’s politicized criminal justice system.’’ The only difference between works in and out of the public domain, is that the title of a work within the public domain communicates source in only rare cases, as anyone has the right to distribute a public domain work and describe it by its title.
 
 See Maljack Productions,
 
 81 F.3d at 887.
 

 [16]
 

 .
 
 See Sugar Busters LLC,
 
 177 F.3d at 269 (referring to the “descriptive nature of a literary title”);
 
 In re Cooper,
 
 254 F.2d at 614-15 (noting that titles are descriptive of the work with which they are associated);
 
 hut see Twin Peaks Productions,
 
 996 F.2d at 1379 n. 4 (deciding that a title was "suggestive,” but still requiring secondary meaning).
 

 [17]
 

 . Thus, a film such as
 
 The Godfather
 
 is not merely a species of motion picture, it is a species of the "mobster movie” genre, a genre that includes,
 
 inter alia, GoodFellas, Miller's Crossing,
 
 and
 
 Casino.
 
 Similarly, the
 
 Star Trek
 
 and
 
 Star Wars
 
 movies are species of the science fiction genre. There are many standard genres in film and literature, including drama, action, comedy, war, mystery, suspense, thriller, and horror. In time, the body of expressive work becomes more complex; existing categories evolve and new categories are created. For example, the genre "independent film,” which entered the lexicon relatively recently, now describes an entire class of motion pictures.
 

 [18]
 

 . Examples of this abound. One journalist commented that " ‘first contact’ novels, that
 
 *712
 
 is, those that deal with the citizens of Earth first meeting up with extraterrestrials, are nearly ubiquitous in science fiction.” Mark Graham,
 
 Infobox: New To Dean Koontz,
 
 The Rocky Mountain News, Dec. 26, 1999, at IE. Another journalist described the film
 
 Close Encounters of the Third Kind
 
 as a "magical 'first contact’ tale.” Michael Wilmington,
 
 In Focus,
 
 Chicago Tribune — TV Week, Oct. 24, 1999, at 35. Yet another journalist concluded that "the subject of first contact with alien species ... has been one of our century’s favorite subjects for fiction.” John Lanches-ter,
 
 Arts & Books Feature: Making War on Working, H.G. Wells Memorial,
 
 The Daily Telegraph (London), January 30, 1999, at 5.
 

 [19]
 

 . John Clute and Peter Nicholls,
 
 Encyclopedia of Science Fiction
 
 251 (2d ed.1993);
 
 see also First Contact
 
 (visited March 15, 2000) chttp: //www.sfsite.com/~silverag/ contact.htm> (listing dozens of "first contact stories,” including Jenkins’ story);
 
 Prototype Worlds: A Glossary of SF Jargon
 
 (visited March 15, 2000) chttp: //www. tuxedo.org/~esr/sf-words/index.html> (defining "first-contact story” as "one of SF's most unique and characteristic forms,” and listing Jenkins’ story as the "paradigm example” of the genre);
 
 Ultimate Science Fiction Web Guide, Timeline 1940-1950
 
 (visited March 20, 2000) chttp: //www.magicdragon.com/Ulti-mateSF/timelinel950.html> ("Murray Lein-ster’s classic story 'First Contact’ creat[ed] the very name of this subgenre of first-time meetings between human and extraterrestrial [sic].”).
 

 [20]
 

 .
 
 See First Contact: The Search for ExtraTerrestrial Intelligence
 
 (Ben Bova and Byron Preiss, eds.1990);
 
 First Contact
 
 (Martin Greenberg & Larry Segriff, eds., 1997). -The latter, an anthology ,of short stories, actually includes the story "First Contact, Inc.” by Julie E. Czernada.
 

 [21]
 

 . A familiar example clarifies this conclusion.
 
 Star Wars
 
 is perhaps the most famous action movie set in outer space, a category of movies that includes the entire
 
 Star Trek
 
 series,
 
 The Last Starfighter, Starship Troopers, Independence Day,
 
 and even
 
 Ice Pirates.
 
 While
 
 Star Wars
 
 is arguably the king of this genre, people do not refer generically to "Star Wars” stories, or "Star Wars” movies, unless they are referring to the actual series itself. Occasionally, a movie outside of the
 
 Star Wars
 
 series will be referred to, optimistically, as the "next
 
 Star Wars.”
 
 But this is plainly an allusion to George Lucas’s work, and not to an entire class of movies.
 

 [22]
 

 . Plaintiffs admit that FIRST CONTACT refers to a genre of science fiction, but contend that, when used as the title of single work, the phrase remains descriptive. This is contrary to the law, as an otherwise valid trademark becomes generic once it "ceases to identify in the public’s mind the particular source of a product or service but rather identifies a class of product or service, regardless of source.”
 
 Glover,
 
 74 F.3d at 59;
 
 see King-Seeley Thermos Co. v. Aladdin Indus., Inc.,
 
 321 F.2d 577 (2d Cir.1963) (finding that "thermos,” once an exclusive trademark, had become the generic term for "vacuum bottle").
 

 [23]
 

 .
 
 See Perini Corp. v. Perini Constr., Inc.,
 
 915 F.2d 121, 125 (4th Cir. 1990);
 
 Lone Star Steakhouse & Saloon v. Alpha of Virginia,
 
 43 F.3d 922, 936 n. 16 (4th Cir. 1995) (noting that actual confusion is evidence of secondary meaning).
 

 [24]
 

 . Plaintiffs rely on the fact that Jenkins’ story was, and remains, very popular among fans of science fiction. Since Jenkins’ story appeared in
 
 Astounding Science Fiction
 
 in 1945, (i) it has been reprinted in numerous science fiction anthologies, (ii) it was released as a ‘'book-on-tape” on two occasions, (iii) it was broadcast on radio in the 1950s, and (iv) the story was told in a television show in 1967. Moreover, in 1970 Jenkins’ story earned a place in the Science Fiction Hall of Fame (a one volume anthology of science fiction stories), and Jenkins himself has been referred to as a "classic” science fiction writer and the "dean of science fiction.” And, in 1996, Jenkins’ story earned a Retro-Hugo award, for best novellette of 1946. From this, plaintiffs argue that the consuming public, at least those in the so-called "science fiction community,” associate the phrase FIRST CONTACT with Murray Leinsler/William Jenkins. Yet plaintiffs offer no surveys or other studies beyond anecdotal evidence to suggest that the consuming public believes the phrase FIRST CONTACT indicates a particular source.
 
 See Sugar Busters LLC v. Brennan,
 
 177 F.3d 258, 269 (5th Cir. 1999) ("Because the determination of whether a mark has acquired secondary meaning is primarily an empirical inquiry, survey evidence is the most direct and persuasive evidence.”) (citation and internal quotation marks omitted). And, the fact that a particular story is well received is not enough to support a finding of secondary meaning; for example, Stephen Am-brose’s book,
 
 Ü-Day,
 
 is a famous, well regarded book. But that does not mean that the word "D-Day” has secondary meaning.
 

 [25]
 

 . For example, a Lexis-Nexis search in the Allnews file of the News library for the phrase "first contact” within fifteen words of the terms "alien,” "extraterrestrial,” "UFO,” or "science fiction,” and without reference to “Star Trek” or "Leinster,” yielded 319 stories. And the Internet is rife with references to the phrase FIRST CONTACT in the context of encounters with aliens. F’or example, a poem available online, titled “First Contact,” begins "They were the most beautiful men and women I had ever seen/ They claimed to come overnight to Earth from pleaides.”
 
 First Contad
 
 (visited March 15, 2000) <http://members.cruzio.corn/~quanla/ alienl. html>;
 
 see also, e.g.,
 
 Louise Surette,
 
 Professor predicts first contact with aliens some time next century,
 
 Ottawa Citizen Online (visited March 20, 2000) <http://www.ottawacitizen.com/national>;
 
 2020 Vision: First Contact,
 
 SFWriter.Com: The Robert J. Sawyer Web Site (visited March 20, 2000) <http://www.sfwriter.com/20contac.htm>; Andy Nimmo,
 
 First Contad? Send YOUR Message, YOUR photo, and YOUR DNA to the Stars,
 
 FTL Magazine (visited March 20, 2000) <http:// www.ftlmagazine.com/ features/an2..html>;
 
 First Contact? A Brief History of the Roswell Incident and It's Namesalce UFO Festival
 
 (visited March 20, 2000) <http: //roswellufoencounter.com/ history. htm>. Widespread use of the phrase FIRST CONTACT in this context suggests that the mark lacks secondaiy meaning with respect to Jenkins’ story.
 

 There are, of course, references to the phrase FIRST CONTACT that do not involve space aliens. For example, www.first.con-
 
 *714
 
 tact.com pays homage to a Canadian race car driver.
 
 See First Contact: A tribute to Canadian Formula One racer Gilíes Villeneuve
 
 (visited March 20, 2000) <http.//www.firstcon-tact.com>. And, there appears to be a vast "first contact” literature .that considers an indigenous people's "first contact” with another civilization.
 

 [26]
 

 . Plaintiffs claim, in a footnote, that a separate "misappropriation” claim remains.
 
 See International News Service v. Associated Press,
 
 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918). It is hornbook law "that if plaintiff has failed under classic trademark law to prove trademark ownership and infringement, then plaintiff cannot claim that defendant has 'misappropriated' the labor expended in creating the ‘trademark.’ ” 2 McCarthy on Trademarks § 10.72;
 
 see Toho Co., Ltd. v. Sears, Roebuck & Co.,
 
 645 F.2d 788, 794 (9th Cir.1981) (refusing to extend California misappropriation law to trademarks).
 

 [27]
 

 . This is not an “exceptional” case warranting an award of defendant’s attorneys fees.
 
 See
 
 15 U.S.C. § 1117(a);
 
 Bubba’s Bar B-Q Oven, Inc. v. Holland Co., Inc.,
 
 175 F.3d 1013, 1999 WL 183833, at *1 (4th Cir. Apr.5, 1999) (unpublished opinion);
 
 Scotch Whisky Ass’n v. Majestic Distilling Co.,
 
 958 F.2d 594, 599 (4th Cir.1992).